Clearing House Ass'n v. Cuomo

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: December 4, 2006                    Decided: December 4, 2007)

Docket Nos.  05-5996-cv (L), 05-6001-cv (CON)

_____

THE CLEARING HOUSE ASSOCIATION, L.L.C.,

*Plaintiff-Appellee*,

OFFICE OF THE COMPTROLLER OF THE CURRENCY,

*Plaintiff-Counter-Defendant-Appellee,*

— v .—

ANDREW M. CUOMO,[*] IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL FOR THE STATE OF NEW YORK,

*Defendant-Counter-Claimant-Appellant*.

_____

Before:     CARDAMONE and B.D. PARKER, *Circuit Judges*, and KOELTL, *District Judge*.[**]

_____

[*]Pursuant to Fed. R. App. P. 43(c)(2), Andrew M. Cuomo is automatically substituted for former Attorney General Eliot Spitzer in this action.

[**] The Honorable John G. Koeltl, United States District Judge for the Southern District of New York, sitting by designation.

1

The New York State Attorney General appeals from two judgments of the United States District Court for the Southern District of New York (Stein, *J.*), both permanently enjoining him from investigating national banks and their operating subsidiaries for possible violations of federal and state fair lending laws.

AFFIRMED in part, VACATED in part, and REMANDED in part with instructions.

Judge Cardamone concurs in part and dissents in part in a separate opinion.

————————————

CAITLIN HALLIGAN, Solicitor General (Dieter Snell, Deputy Attorney General; Michelle Aronowitz, Deputy Solicitor General; Richard Dearing, Julie Loughran, Shaifali Puri, Assistant Solicitors General, *of counsel*), New York, NY, *for* Andrew M. Cuomo, Attorney General of the State of New York, *Defendant-Counter-Claimant-Appellant.*

ROBINSON B. LACY (H. Rodgin Cohen, Adam R. Brebner, Keith Levenberg, *on the brief*), Sullivan & Cromwell, LLP, New York, NY, *for Plaintiff-Appellee The Clearing House Association, L.L.C.*

DOUGLAS B. JORDAN (Julie L. Williams, Daniel P. Stipano, Horace G. Sneed, *on the brief*), Washington, DC, *for Plaintiff-Counter-Defendant-Appellee Office of the Comptroller of the Currency.*

————————————

BARRINGTON D. PARKER, *Circuit Judge*:

The National Bank Act ("NBA" or "Act") authorizes national banks to engage in a broad range of business activities, and also limits the exercise of "visitorial powers" over such banks.[1]

————

[1] 12 U.S.C. § 484(a) provides:

No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised

The Office of the Comptroller of the Currency ("OCC") is the agency Congress has entrusted to implement the NBA and to oversee the national banks' exercise of their powers. This appeal concerns the residual authority of state officials in regards to laws pertaining to real estate lending, one of the banking activities governed by the NBA and OCC regulations.

I

In 2005, the New York State Attorney General began investigating evidence of possible racial discrimination in the residential real estate lending practices of several national banks and their operating subsidiaries. The Attorney General's investigation was prompted by data that the federal Home Mortgage Disclosure Act ("HMDA") requires lenders to make public. *See* 12 U.S.C. §§ 2801-10. The Attorney General observed that recent HMDA data appeared to indicate that a significantly higher percentage of high-interest home mortgage loans are issued to African-American and Hispanic borrowers than to white borrowers.

On the basis of these apparent racial disparities, the Attorney General sent "letters of inquiry" to mortgage lenders implicated by the data, including several national banks and their operating subsidiaries.[2] The letters stated that such disparities "are troubling on their face, and unless legally justified may violate federal and state anti-discrimination laws such as the Equal Credit Opportunity Act and its state counterpart, New York State Executive Law § 296-a."[3] "In

_____

or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

[2]The banks included Wells Fargo, HSBC, J.P. Morgan Chase, and Citigroup.

[3]Section 296-a broadly prohibits creditors from discriminating on the basis of race, sex, national origin, or other protected grounds. Though not restricted to real estate lending, the

lieu of issuing a formal subpoena," the letters requested that lenders voluntarily produce certain non-public information regarding their mortgage policies and practices, as well as data concerning loans related to real property in New York State.

Soon afterwards, the OCC sued to enjoin the Attorney General's investigative and enforcement efforts. A recently promulgated OCC regulation expansively interpreted the NBA's visitorial powers provision, 12 U.S.C. § 484, to preclude state officials from enforcing national banks' compliance with state or federal laws that concern activities authorized or permitted under the NBA. *See* 12 C.F.R. § 7.4000(a)(2)(iv). On the strength of this regulation, the agency took the position that any efforts by the Attorney General to investigate or to enforce provisions of the Equal Credit Opportunity Act and New York State Executive Law § 296-a against national banks or their operating subsidiaries were an unlawful exercise of visitorial powers.

The Clearing House Association ("Clearing House") – a consortium of national banks, including several that received letters of inquiry from the Attorney General – filed a similar complaint, seeking to enjoin the Attorney General from "investigating, requesting or issuing subpoenas for information concerning, or taking any other action to enforce federal and state discrimination-in-lending laws" against its national bank members and their operating subsidiaries.

The Attorney General counterclaimed, arguing that the OCC's regulation was unlawful

---

statute specifically prohibits discrimination regarding "applications for credit with respect to the purchase, acquisition, construction, rehabilitation, repair or maintenance of any housing accommodation, land or commercial space." N.Y. Exec. Law § 296-a(1)(a). It further bars discrimination "in the granting, withholding, extending or renewing, or in the fixing of the rates, terms or conditions of, any form of credit." *Id.* § 296-a(1)(b).

and should be set aside under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.[4]  In his

Answer, the Attorney General asserted that racial disparities reflected in the HMDA data

"established a *prima facie* case, under the federal Fair Housing Act," 42 U.S.C. § 3605(a), as

well as under New York State Executive Law § 296-a.  The Attorney General contended that his

investigation was not a prohibited exercise of visitorial powers, and that the OCC was not acting

aggressively in this area.  Alternatively, the Attorney General contended that he was empowered,

as *parens patriae*, to sue under the Fair Housing Act ("FHA"), and that even if such a suit were

considered a "visitation" it would come within § 484(a)'s exception for "visitorial powers . . .

authorized by Federal law."

Following a trial on the merits, the United States District Court for the Southern District

of New York (Stein, *J.*) deferred to the OCC's interpretation of the statute, under *Chevron*

*U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984), and concluded that the Attorney

General's investigation was prohibited.  *Office of the Comptroller of the Currency v. Spitzer*, 396

F. Supp. 2d 383 (S.D.N.Y. 2005) ("*OCC v. Spitzer*").  In a separate opinion, the court agreed

with Clearing House that the FHA does not create an exception authorizing the exercise of

visitorial powers otherwise prohibited under § 484(a).  *Clearing House Ass'n, L.L.C. v. Spitzer*,

394 F. Supp. 2d 620 (S.D.N.Y. 2005) ("*Clearing House v. Spitzer*").  Accordingly, in both cases

the court issued the declaratory and injunctive relief sought by the OCC and Clearing House.

We affirm the district court's judgment in *OCC v. Spitzer*.  We affirm in part and vacate

---

[4]The APA provides, in part, that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.

in part the district court's separate judgment in *Clearing House v. Spitzer*. We affirm that part of the *Clearing House* judgment granting Clearing House the injunctive relief provided in *OCC v. Spitzer*. We vacate, however, that part of the *Clearing House* judgment granting permanent injunctive relief against the Attorney General's enforcement of the FHA. We hold that the district court lacked jurisdiction to decide the FHA claim, and we remand the case to the district court with instructions to dismiss that claim.

II

The NBA provides for the creation of national banks, and authorizes them to exercise certain enumerated powers, as well as "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 Seventh. The OCC is the federal agency primarily responsible for overseeing "the business of banking" under the statute. *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995). To that end, the OCC has been granted broad authority by Congress "to prescribe rules and regulations to carry out the responsibilities of the office." 12 U.S.C. § 93a. This includes the authority "to define the 'incidental powers' of national banks beyond those specifically enumerated in the statute." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 312 (2d Cir. 2005); *see also NationsBank*, 513 U.S. at 257-59.

Section 484 provides, in part, that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law [or] vested in the courts of justice." 12 U.S.C. § 484(a). The Supreme Court has defined visitation as "the act of a superior or superintending officer, who visits a corporation to examine into its manner to conducting business, and enforce

6

an observance of its laws and regulations." *Guthrie v. Harkness*, 199 U.S. 148, 158 (1905) (internal quotation marks omitted). We recently observed that the purpose of the visitorial powers restriction is to "prevent inconsistent or intrusive state regulation from impairing the national system." *Burke*, 414 F.3d at 311; *see also Watters v. Wachovia Bank, N.A.*, 127 S. Ct. 1559, 1568 (2007).

In 1996, the OCC adopted a regulation clarifying that, under § 484(a), "the exercise of visitorial powers over national banks is vested solely in the OCC." 12 C.F.R. § 7.4000 (1997); 61 Fed. Reg. 4862, 4869 (Feb. 9, 1996) (final rule). The OCC revised this regulation in 1999 "to clarify the extent of the OCC's vistiorial powers" and to "codif[y] the definition of visitorial powers and illustrate[] what vistitorial powers include by providing a non-exclusive list of these powers." 64 Fed. Reg. 60092, 60094 (Nov. 4, 1999) (final rule). The previous version of the rule had indicated that "[s]tate officials have no authority to conduct examinations or to inspect or require the production of books or records of national banks, except for the limited purpose[s]" specified in § 484(b).[5] 12 C.F.R. § 7.4000 (1997). The revised rule added "prosecuting enforcement actions" against such banks as an example of prohibited state visitorial powers. *See* 64 Fed. Reg. at 60100.

---

[5] 12 U.S.C. § 484(b) provides that, notwithstanding the restriction on visitorial powers in subsection (a):

> [L]awfully authorized State auditors and examiners may, at reasonable times and upon reasonable notice to a bank, review its records solely to ensure compliance with applicable State unclaimed property or escheat laws upon reasonable cause to believe that the bank has failed to comply with such laws.

In its present form, Section 7.4000 lists several examples of prohibited visitations, including "(i) Examination of a bank; (ii) Inspection of a bank's books and records; (iii) Regulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv) *Enforcing compliance with any applicable federal or state laws concerning those activities*." 12 C.F.R. § 7.4000(a)(2) (emphasis added).

The regulation also addresses the exceptions included in § 484(a) for visitorial powers "authorized by Federal law" and "vested in the courts of justice." The OCC construes the courts-of-justice exception as "pertain[ing] to the powers inherent in the judiciary" and "not grant[ing] state or other governmental authorities any right to inspect, superintend, direct, regulate or compel compliance by a national bank with respect to any law, regarding the content or conduct of activities authorized for national banks under Federal law." 12 C.F.R. § 7.4000(b)(2); 69 Fed Reg. 1895, 1904 (Jan. 13, 2004) (final rule). OCC regulations do not directly interpret the "authorized by Federal law" exception, but rather provide a non-exclusive list of federal "laws vesting visitorial power in other governmental entities," including state officials, to engage in particular visitorial acts. 12 C.F.R. § 7.4000(b)(1). These include, for example, "[v]erify[ing] payroll records for unemployment compensation purposes," pursuant to the Internal Revenue Code, 26 U.S.C. § 3305(c); "[a]scertain[ing] the correctness of Federal tax returns," under 26 U.S.C. § 7602; and "[e]nforc[ing] the Fair Labor Standards Act," under 29 U.S.C. § 211. *Id*. §§ 7.4000(b)(1)(iii), (iv), (v).

III

We review a district court's grant of a permanent injunction for abuse of discretion.

8

*Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004). A district court abuses its discretion when it bases its decision on an error of law or a clearly erroneous finding of fact. *Id.*; *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 237 (2d Cir. 2001). Although the parties disagree about the facts underlying the Attorney General's investigation – especially the significance of the HMDA data as evidence of possible racial bias in mortgage lending – those facts are not at issue here. The only questions before us are legal ones.

A

Central to the parties' dispute is the meaning of the term "visitorial powers" in § 484(a). The OCC argues that its interpretation of "visitorial powers" should be afforded *Chevron* deference while the Attorney General denies that the OCC's interpretation is entitled to such deference. Under *Chevron*, we first ask whether Congress has spoken directly to the precise question at issue. *Chevron*, 467 U.S. at 842. If Congress's intent is clear, both the court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. If, however, "the statute is silent or ambiguous with respect to the specific issue," we proceed to the second step of the *Chevron* analysis, in which "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

The Attorney General raises an initial argument that the *Chevron* framework does not apply to the OCC's interpretation of the statute at issue here. The Attorney General argues that by limiting the visitorial powers that apply to national banks, Congress clearly did not intend to divest states of the authority to enforce their own otherwise non-preempted laws against such banks. Such authority, the Attorney General contends, is an intrinsic aspect of state sovereignty

9

and its exercise cannot be curtailed in the absence of a clear statement of Congressional intent. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." (internal quotation marks omitted)); *see also Diamond v. Charles*, 476 U.S. 54, 65 (1986) ("[T]he power to create and enforce a legal code, both civil and criminal is one of the quintessential functions of a State." (internal quotation marks omitted)). Accordingly, the Attorney General urges us not to afford *Chevron* deference to the OCC's interpretation of the statute, as the district court did.

The first question is whether a presumption against preemption applies to the OCC's regulation interpreting § 484(a). Federal preemption can be express or implied, but in either case is primarily a question of Congressional intent. *See Barnett Bank of Marion County., N.A. v. Nelson*, 517 U.S. 25, 31 (1996). "Preemption can generally occur in three ways: where Congress has expressly preempted state law, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or where federal law conflicts with state law." *Burke*, 414 F.3d at 313; *see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). "Federal regulations have no less pre-emptive effect than federal statutes." *de la Cuesta*, 458 U.S. at 153.

Ordinarily, a presumption against preemption applies in areas of regulation traditionally allocated to the states. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."). In *Wachovia v.*

*Burke*, we observed that this presumption "disappears" in the context of national bank regulation, which has been "substantially occupied by federal authority for an extended period of time." *Burke*, 414 F.3d at 314 (internal quotation marks omitted); *see also Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 183 (2d Cir. 2005). Historically, the Supreme Court has "interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank*, 517 U.S. at 32. The district court, therefore, did not err in determining that no presumption against preemption applies to the regulation at issue here.

For essentially the same reason, we also reject the Attorney General's reliance on the somewhat broader principle that – whether or not a presumption against preemption applies – "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001) ("*SWANCC*"). That broader principle is rooted in the doctrine of constitutional avoidance, which the Supreme Court has recognized may, in some instances, trump the deference typically afforded to an agency's interpretation of the statute it administers. *See id.*; *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). The concern about reaching constitutional issues unnecessarily, and the corresponding demand for a clear statement from Congress, is "heightened where the

11

administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *SWANCC*, 531 U.S. at 173.

The Attorney General has not demonstrated that acceptance of the OCC's interpretation of § 484 would cast doubt on the constitutionality of the underlying statute. *Cf. id.*; *DeBartolo*, 485 U.S. at 575-76. Nor do we see any reason to believe that such interpretation invokes the outer limit of *Congress's* power so as to trigger a clear statement requirement. National banks, as creatures of federal statute, are subject first and foremost to federal law. As a result, the exercise of "traditional" state power in the context of national banking regulation is already substantially qualified. While national banks do not operate entirely free of state law obligations, "[s]tates can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit." *Farmers' & Mechs.' Nat'l Bank v. Dearing*, 91 U.S. 29, 34 (1875); *see Watters*, 127 S. Ct. at 1567. Where, as here, Congress has already expressed its intent to limit the role of the states in regulating national banks – especially when such conduct involves the exercise of powers granted to the banks by federal statute and regulation – we do not perceive the need for any further statement of intent to achieve the limitation at issue here. On this basis, we conclude that the district court did not err in finding that a clear statement was not required to justify the OCC's interpretation of § 484(a).

## B

We turn next to the Attorney General's contention that § 484(a) is clear, and that the

statute precludes the interpretation the OCC has adopted.[6] As we have already noted, the first question we ask in reviewing an agency's construction of the statute it administers is "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. The two questions at issue here both concern the scope of visitorial powers encompassed by § 484(a). They are: (1) whether Congress intended to preclude state officials from enforcing non-preempted state laws that, like New York's discrimination-in-lending law, concern the federally authorized activities of national banks; and (2) whether Congress intended to permit state officials to exercise otherwise prohibited visitorial powers by bringing actions in the "courts of justice."

(i)

In construing § 484(a), we do not write on a blank slate. The Supreme Court interpreted "visitorial powers" in the context of the NBA for the first time in *Guthrie v. Harkness*, 199 U.S. 148 (1905). At issue in *Guthrie* was whether the NBA precludes an individual shareholder from inspecting the books and records of a national bank. The Court examined various dictionary definitions of the term "visitorial," and summarized its common law history. Based on these various sources, the Court concluded that the visitorial powers restricted by Congress in the NBA do not include "the common-law right of the shareholder to inspect the books of the corporation." *Id.* at 157. This conclusion followed from the Court's acknowledgment that "[t]he

---

[6]The Attorney General concedes on appeal, as he did below, that if the OCC's regulation is upheld, it would bar his investigation and threatened enforcement action, except insofar as he asserts a right to proceed under the FHA. *See OCC v. Spitzer*, 396 F. Supp. 2d at 390.

right of visitation [is] a *public* right, existing in the state for the purpose of examining into the conduct of the corporation with a view to keeping it within its legal powers." *Id*. at 158-59 (emphasis added).

The Attorney General suggests that although *Guthrie* involved a lawsuit brought by a private plaintiff, the Court's opinion is consistent with the understanding that "visitation" refers primarily to examination of a corporation's books and records for the limited purposes of managerial oversight and monitoring compliance with a bank's charter, and that the term does not encompass enforcement of state laws of general applicability. This understanding, the Attorney General maintains, is reinforced by the text and structure of the NBA.

In its current form, the NBA details the OCC's specific examination powers over national banks in a different section from the visitorial powers restriction. *See* 12 U.S.C. § 481. Originally, these two provisions were set forth in the same section of the Act, which provided that national banks "shall not be subject to any *other* visitorial powers than such as are authorized by this act." Act of June 3, 1864, ch. 106, § 54, 13 Stat. 99, 116 (emphasis added). Notwithstanding the NBA's subsequent reorganization, the Attorney General argues that the visitorial powers language currently found in § 484(a) simply forbids the states from usurping those regulatory powers that the statute grants explicitly to the OCC. In this interpretation, § 484(a) would act mainly as a constraint on the administrative powers exercised by state banking officials.

As the court below pointed out, the Attorney General's proposed reading ignores the fact that the NBA, both as originally enacted and in its present version, authorizes the OCC to sue in

14

its own name to redress certain violations – a power that might itself be considered visitorial. *See OCC v. Spitzer*, 396 F. Supp. 2d at 394; Act of June 3, 1864, ch. 106, § 53, 13 Stat. 99, 116 (codified at 12 U.S.C. § 93(a)); *see also Guthrie*, 199 U.S. at 157 ("The visitation of civil corporations is by the government itself, through the medium of the courts of justice."); Roscoe Pound, *Visitatorial Jurisdiction Over Corporations In Equity*, 49 Harv. L. Rev. 369, 372 (1936) (noting that at common law, visitorial powers were executed primarily by "the King act[ing] through his courts").

The Supreme Court's decision in *Wachovia v. Watters* casts further doubt on the Attorney General's interpretation. *Watters* involved the State of Michigan's effort to enforce two statutes concerning mortgage lending against a national bank's operating subsidiary, Wachovia Mortgage. The statutes imposed registration and disclosure requirements on mortgage lenders, including national bank operating subsidiaries and other state-chartered institutions. *Watters*, 127 S. Ct. at 1565-66. They also granted to the commissioner of Michigan's Office of Insurance and Financial Services "inspection and enforcement authority over registrants," and "authorize[d] the commissioner to take regulatory or enforcement actions against covered lenders." *Id*. at 1566. The State argued – contrary to another recent OCC regulation, 12 C.F.R. § 7.4006 – that operating subsidiaries are not themselves national banks, and that state laws regulating such subsidiaries are therefore applicable and enforceable. *Id.*

The powers granted to the commissioner under the Michigan statutes, the Court observed, were undeniably "visitorial" and thus, as the parties conceded, could not be applied to national banks themselves. "State laws that conditioned national banks' real estate lending on registration

15

with the State," the Court explained, "*and subjected such lending to the State's investigative and enforcement machinery* would surely interfere with the banks' federally authorized business." *Id.* at 1568 (emphasis added). Citing § 484(a), as well as the OCC's definition of visitorial powers in 12 C.F.R. § 7.4000(a)(2), the Court concluded that Michigan "cannot confer on its commissioner examination and enforcement authority over mortgage lending, or any other banking business done by national banks." *Id.* at 1569. Because the banks' "authority to engage in the business of mortgage lending comes from the NBA . . . as does the authority to conduct business through an operating subsidiary," the OCC's exclusive visitorial powers under § 484(a) extend to operating subsidiaries engaged in mortgage lending just as to their parent national banks.[7] *Id.* at 1572.

In this regard, the Court in *Watters* concluded that the level of deference owed to the OCC's regulation, § 7.4006, "is an academic question," since that regulation "merely clarifies and confirms what the NBA already conveys: A national bank has the power to engage in real estate lending through an operating subsidiary, subject to the same terms and conditions that govern the national bank itself; that power cannot be significantly impaired or impeded by state

---

[7]In *Watters*, the Court emphasized the unique characteristics of national bank operating subsidiaries, which are "licensed by OCC" and whose authority to carry on the business of banking – according to statute – coincides completely with that of the parent bank. 127 S. Ct. at 1571. The Court pointed out that Congress has distinguished operating subsidiaries from other "affiliates"of national banks. *Id.* Accordingly, while we hold below that, in accordance with OCC regulations, the Attorney General is precluded from investigating either parent national banks or their operating subsidiaries for alleged violations of state fair lending laws, our reasons for this conclusion would not apply to the quite different question of whether a state investigation or enforcement action directed at any other type of national bank affiliate would necessarily violate § 484(a). Nor do we understand the OCC to have taken any position on this issue.

16

law." *Id*. at 1572; *cf. Burke*, 414 F.3d at 321 (upholding § 7.4006 on the basis of a *Chevron* analysis).

*Watters* does not directly address the questions at issue here. Nevertheless, the Court implied that investigation and enforcement by state officials are just as much aspects of visitorial authority as registration and other forms of administrative supervision, and that the OCC was not clearly wrong to include in its definition of visitorial powers "[e]nforcing compliance with any applicable federal or state laws concerning" a national bank's authorized banking activities. 12 C.F.R. § 7.400(a)(2)(iv); *see Watters*, 127 S. Ct. at 1568-69. Even more significantly, *Watters* emphasized that "in analyzing whether state law hampers the federally permitted activities of a national bank, [the Court] ha[s] focused on the exercise of a national bank's *powers*." *Id*. at 1570.

The *Watters* dissent maintained, as the Attorney General does here, "that nondiscriminatory laws of general application that do not 'forbid' or 'impair significantly' national bank activities should not be preempted." *Id*. at 1574 (Stevens, J., dissenting). The premise of the majority opinion, however, is that enforcement of a state law purporting to regulate a national bank's exercise of the powers it has been granted under the NBA may constitute a prohibited visitation under § 484(a), whether or not the law itself directly conflicts with a federal statute or regulation.[8]

---

[8]The Attorney General also argues that the OCC's interpretation of § 484(a) is foreclosed by *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640 (1924). In that case the Court upheld Missouri's enforcement of a state statute prohibiting national banks from establishing branches, reasoning that because the statute itself was valid and not preempted, "the corollary that it is obligatory and enforceable necessarily results . . . and, since the sanction behind it is that of the

17

Although the precise scope of "visitorial" powers is not entirely clear from the text of § 484(a), or the common law background of the term, we cannot agree with the Attorney General that the statute clearly precludes the interpretation the OCC has adopted. It seems clear to us, after *Watters*, that investigative and enforcement powers of the type the Attorney General has sought to exercise here are at least in some sense "visitorial," whether or not they unambiguously fall within the scope of § 484(a). *Cf. Nat'l State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 989 (3d Cir. 1980) (concluding that while "[i]t is not clear just what 'visitorial' powers include . . . they do encompass examination of the bank's books and records," and thus enforcement of an otherwise non-preempted state "antiredlining" statute was barred by § 484(a), since such enforcement "no doubt would require examination of bank records"). Moreover, we are not prepared to conclude, as the Attorney General urges us to, that simply because a state statute is not substantively preempted by a contrary federal law, enforcement of that statute by state officials against national banks is necessarily permitted under § 484(a).

(ii)

The Attorney General maintains that even if his investigation may be construed as a visitation, it is nonetheless permitted under § 484's express exception for visitorial powers "vested in the courts of justice." To support this argument, the Attorney General relies primarily on what might be read as an alternative holding in *Guthrie*. Having concluded that the NBA's

_____

state and not that of the national government, the power of enforcement must rest with the former and not with the latter." *Id*. at 659-60. The Court's opinion did not directly address the NBA's restriction of state visitorial powers. Moreover, at the time, national banks had not been authorized by federal law to establish branches. Thus, unlike this case, *St. Louis* did not involve a state law that affected a national bank's *powers* under the NBA.

18

visitorial powers restriction did not foreclose a shareholder from seeking to enforce his common law right of inspection against a national bank, the Court in *Guthrie* observed that such inspection, "even if included in visitorial powers as the terms are used in the statute," would nevertheless "belong to that class 'vested in the courts of justice' which are expressly excepted from the inhibition of the statute." *Guthrie*, 199 U.S. at 159.

The Attorney General's proposed interpretation of the "courts of justice" exception cuts too broadly. If a state official could sidestep the Act's restriction on the exercise of visitorial powers simply by filing a lawsuit, the exception would swallow the rule. Moreover, as we note above, the sovereign's bringing of an action in court was a primary means of exercising visitorial powers at common law. Because *Guthrie* involved a suit initiated by a private plaintiff, the *only* possible exercise of visitorial powers would have been by the court itself. *See Guthrie*, 199 U.S. at 158-59 ("The right of visitation [is] a *public* right . . . ." (emphasis added)). Whatever the scope of the courts of justice exception, it cannot be as broad as the Attorney General suggests, since that interpretation would provide no effective restriction on the exercise of a state's visitorial powers over national banks.

C

Since "Congress has not directly addressed the precise question[s] at issue," we proceed to step two of the *Chevron* framework, under which we ask "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. We will defer to an agency's statutory interpretation, so long as it is reasonable and does not conflict with Congress's expressed intent. *See id.* at 845; *Skubel v. Fuoroli*, 113 F.3d 330, 336 (2d Cir. 1997).

An agency's interpretation may be reasonable, and thus worthy of deference, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *see also G & T Terminal Packaging Co., Inc. v. U.S. Dep't of Agriculture*, 468 F.3d 86, 95 (2d Cir. 2006) ("[U]nless we find the [agency's] construction of the statute to be arbitrary, capricious, or manifestly contrary to the statute, we must yield to that construction of the statute even if we would reach a different conclusion of our own accord." (internal quotation marks and citation omitted)).

The Attorney General makes two preliminary arguments for why we should not defer to the OCC's interpretation of § 484(a). Both were properly rejected by the district court. First, the Attorney General argues that the OCC's regulation, 12 C.F.R. § 7.4000, falls outside the scope of its delegated rulemaking authority. This argument fails because, as the district court pointed out, Congress conferred broad authority on the OCC to implement the NBA. *See* 12 U.S.C. § 93a. Accordingly, the Supreme Court has routinely deferred to the OCC's interpretations of that statute where Congress's intent is ambiguous:

> It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws.

*NationsBank*, 513 U.S. at 256-57 (internal quotation marks omitted). We see no reason to depart from this settled principle here.

Second, the Attorney General contends that no deference is owed to the regulation

20

because it interprets purely legal concepts, as opposed to technical matters within the OCC's expertise. This contention is significantly more troublesome. We have previously observed that "an [administrative] agency has no special competence or role in interpreting a judicial decision." *New York v. Shalala*, 119 F.3d 175, 180 (2d Cir. 1997) (internal quotation marks and citation omitted).

The administrative record here consists almost entirely of the agency's interpretation of case law, legislative history, and statutory text. *See, e.g.*, 69 Fed. Reg. 1895, 1897-1900 (Jan. 13, 2004) (final rule); 64 Fed. Reg 31749, 31751 (June 14, 1999) (NPRM). These are not subjects on which the OCC holds any special expertise, nor has the OCC identified any particularly technical aspect of the regulatory subject matter that the agency is "'uniquely qualified' to comprehend." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 496 (1996)); *see also Watters*, 127 S. Ct. at 1584 (Stevens, J., dissenting). To warrant *Chevron* deference, we ordinarily require administrative agencies to "articulate a logical basis for their decisions, including a rational connection between the facts found and the choices made." *Skubel*, 113 F.3d at 336 (internal quotation marks omitted). Yet the OCC does not appear to have found any facts at all in promulgating its visitorial powers regulation. It accretes a great deal of regulatory authority to itself at the expense of the states through rulemaking lacking any real intellectual rigor or depth. Indeed, there is very little about the OCC's rather cursory analysis that, in a different context, could justify this Court's deference under *Chevron*. The OCC's analysis is at or near the outer limits of what *Chevron* contemplates.

Nevertheless, it does not follow that an agency's attempts to harmonize its rulemaking

21

with judicial precedent – as the OCC has done here, *see, e.g.*, 69 Fed. Reg. 1895, 1897-1900 – necessarily invalidate that rulemaking. *Cf. Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2350-51 (2007). We remain bound to uphold the agency's rule so long as it is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. Because we conclude that the rule the OCC adopted is not inconsistent with judicial precedent, the Attorney General's argument is unavailing.

Rather than analyzing the OCC's regulation in the abstract, we begin by emphasizing that the investigation and threatened enforcement action it would preclude in this instance concern real estate lending – precisely the same banking activity that was at issue in *Watters*. The authority of national banks to engage in that activity is a power that Congress has expressly granted under the NBA, subject to rules prescribed by the OCC. 12 U.S.C. § 371. It is thus "[b]eyond genuine dispute" that "state law may not significantly burden a national bank's own exercise of its real estate lending power, just as it may not curtail or hinder a national bank's efficient exercise of any other power, incidental or enumerated under the NBA." *Watters*, 127 S. Ct. at 1567.

In 2004, the OCC adopted a separate regulation detailing certain categories of preempted state law limitations on a national bank's real estate lending powers, including laws that concern licensing and registration, loan-to-value ratios, disclosure and advertising, and interest rates. 12 C.F.R. § 34.4(a). That same regulation also sets forth categories of state laws that "are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending

22

powers." *Id*. § 34.4(b). These include contracts, torts, criminal law, zoning, and other broad subject areas that do not relate specifically to the business of banking. *Id*.

In addition to being unencumbered by state laws that are preempted, either by the NBA itself or by OCC regulations, "real estate lending, when conducted by a national bank, is immune from state visitorial control" as a result of § 484(a). *Watters*, 127 S. Ct. at 1567. Such immunity attaches not because of any specific conflict between state and federal law, but because "[t]he NBA specifically vests exclusive authority to examine and inspect in [the] OCC." *Id*. In this regard, the NBA's restriction on visitorial powers reflects Congress's overall judgment that, in the context of national bank regulation, "confusion would necessarily result from control possessed and exercised by two independent authorities." *Easton v. Iowa*, 188 U.S. 220, 232 (1903); *see Watters*, 127 S. Ct. at 1568.

Likewise, the OCC's regulation is "consistent with the intent of creating a national banking system that is subject to cohesive, uniform supervision by the primary regulator of national banks." 64 Fed. Reg. at 60095. In our reading, § 7.4000 does not, as the Attorney General suggests, claim for the OCC unfettered authority to preempt the states from enforcing their own laws or otherwise alter the role that states have traditionally occupied in our "dual banking system." *Cf. Atherton v. FDIC*, 519 U.S. 213, 221 (1997); *Watters*, 127 S. Ct. at 1573 (Stevens, J., dissenting). Nor does the regulation change the extent to which national banks remain "subject to state laws of general application in their daily business." *Watters*, 127 S. Ct. at 1567; *see also Barnett Bank*, 517 U.S. at 33 (recognizing the power of states to regulate national banks "where . . . doing so does not prevent or significantly interfere with the national

23

bank's exercise of its powers"). Rather, the OCC's regulation simply confirms that where, as here, a state law specifically concerns "activities authorized or permitted pursuant to federal banking law," 12 C.F.R. § 7.4000(a)(2), its enforcement by state officials may constitute a prohibited visitation.

In drawing the lines that it did in § 7.4000(a), the OCC reached a permissible accommodation of conflicting policies that were committed to it by the statute. As we have described above, the OCC's regulation furthers Congress's intent, through § 484(a) and other provisions of the NBA, to shield national banks "from unduly burdensome and duplicative state regulation" in the exercise of their federally authorized powers, such as real estate lending. *Watters*, 127 S. Ct. at 1567. At the same time, it preserves state sovereignty by leaving state officials free to enforce a wide range of laws that do not purport to regulate a national bank's exercise of its authorized banking powers, as well as by not preempting state laws – including New York State Executive Law § 296-a – that do not directly conflict with such powers. Such laws, we note, remain enforceable by private parties, as well as by the OCC itself.[9]

Furthermore, as the district court pointed out, the OCC's interpretation of § 484(a) as restricting the authority of states to enforce certain otherwise non-preempted laws finds support in another recent Congressional enactment, the Riegle-Neal Interstate Branch Banking and

---

[9]Executive Law § 296-a authorizes a cause of action for private plaintiffs who are injured on the basis of a protected ground. *See, e.g.*, *Dunn v. Fishbein*, 507 N.Y.S.2d 29 (N.Y. App. Div. 1986). Although the issue is not before us, the parties do not dispute that private parties would remain free under the OCC's regulation to bring individual or, where appropriate, class actions against national banks to enforce compliance with non-preempted state laws, regardless of the subject matter such laws concern. This understanding, moreover, is consistent with *Guthrie*'s construal of the right of visitation as an essentially *public* right. *See Guthrie*, 199 U.S. at 158-59.

24

Efficiency Act of 1994.  The Riegle-Neal Act permits national banks to establish interstate branches, and provides that such branches remain subject to "[t]he laws of the host State regarding community reinvestment, consumer protection, [and] fair lending," except when such laws are federally preempted or determined by the OCC to have a discriminatory effect on national banks.  12 U.S.C. § 36(f)(1)(A).  However, the Act specifies that insofar as such state laws remain applicable, they "shall be enforced . . . by the Comptroller of the Currency."  *Id.* § 36(f)(1)(B).  We need not determine today whether, by this provision, Congress intended to make the OCC's enforcement authority exclusive with regard to interstate branches – a matter about which the OCC and the Attorney General, predictably, hold opposite views.  It is sufficient to note that the Riegle-Neal Act, when read in conjunction with § 484(a), highlights the reasonableness of the OCC's interpretation concerning the scope of its exclusive visitorial powers.

Finally, we agree with the district court that the OCC permissibly interpreted the "courts of justice" exception under § 484(a) as pertaining only "to the powers inherent in the judiciary" and as not "grant[ing] state or other governmental authorities any right to inspect, superintend, direct, regulate or compel compliance by a national bank with respect to any law, regarding the content or conduct of activities authorized for national banks under Federal law."  12 C.F.R. § 7.4000(b)(2); *see OCC v. Spitzer*, 396 F. Supp. 2d at 404-06.  As we have indicated, the Attorney General's proposed interpretation of this exception would swallow the rule.  The notion that the exception was intended to permit lawsuits, as opposed to administrative actions, appears particularly misguided since at the time the NBA was enacted, visitorial powers were primarily

exercised through the bringing of actions in court. *See, e.g.*, *Guthrie*, 199 U.S. at 157 ("The visitation of civil corporations is by the government itself, through the medium of the courts of justice."); *see also OCC v. Spitzer*, 396 F. Supp. 2d at 405.

By contrast, the OCC has put forth a more reasonable interpretation that comports with the text of the statute, as well as Congress's overall intent. The exception, as the OCC interprets it, confirms that § 484(a) does not strip the courts of any inherent authority they possess to issue subpoenas, for example, against a national bank, or to exercise jurisdiction over such a bank where it is otherwise proper to do so, simply because such acts in and of themselves might be considered "visitorial." *See, e.g.*, *NLRB v. N. Trust Co.*, 148 F.2d 24, 29 (7th Cir. 1945); *Overfield v. Pennroad Corp.*, 113 F.2d 6, 12 (3d Cir. 1940). At the same time, the OCC properly determined that this exception does not positively grant authority to state officials to accomplish what § 484(a) otherwise forbids "by invoking the power of the courts." *OCC v. Spitzer*, 396 F. Supp. 2d at 406.

We conclude that the district court did not err in deferring to the OCC's interpretation of § 484(a), as set forth in 12 C.F.R. § 7.4000. Because we are not prepared to conclude that the OCC's interpretation was arbitrary or otherwise not in accordance with law, the Attorney General's Administrative Procedure Act counterclaim fails. 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). We therefore affirm the declaratory and injunctive relief ordered by the district court in *OCC v. Spitzer*, 396 F. Supp. 2d at 407-08.

IV

The Attorney General argues that even if he is precluded from enforcing New York State law against the national banks, under § 484(a) and § 7.4000, he nevertheless is permitted to bring an action against such banks to enforce the federal Fair Housing Act, in a *parens patriae* capacity.[10]  The Attorney General first mentioned the FHA in his Answer to the OCC's complaint, and only later clarified that the basis for a potential suit under that statute might be his *parens patriae* authority.  The district court concluded that whether or not a state attorney general has standing to sue under the FHA as *parens patriae*, such an action would constitute a visitation and would not fall within the exception in § 484(a) for visitorial powers "authorized by Federal law." *Clearing House v. Spitzer*, 394 F. Supp. 2d at 620.

We note at the outset that the OCC did not address the issue of whether the FHA creates a federally authorized exception under § 484(a), and declined to take a position on this issue in the court below on the ground that it was not ripe for adjudication.  In its brief to this Court, the OCC purports to have changed its mind regarding ripeness, and now aligns itself with Clearing House on the merits of the claim.  We also note that while no party contested our jurisdiction over Clearing House's claim, the Attorney General did argue below that the court lacked subject matter jurisdiction.  Moreover, we have an independent obligation to ensure that subject matter jurisdiction exists, and we therefore raise the issue *nostra sponte*. *Joseph v. Leavitt*, 465 F.3d 87,

---

[10]The FHA prohibits "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin."  42 U.S.C. § 3605(a).

27

89 (2d Cir. 2006); *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 184 (2d Cir. 2006).

We perceive two aspects to this question of jurisdiction. The first is whether Clearing House has properly grounded its complaint in a federal question, consistent with the "well-pleaded complaint" rule. *See Fleet Bank, Nat'l Ass'n v. Burke*, 160 F.3d 883, 886 (2d Cir. 1998) (noting that the rule "requires a complaint invoking federal question jurisdiction to assert the federal question as part of the plaintiff's claim, and precludes invoking federal question jurisdiction merely to anticipate a federal defense" (internal citations omitted)). The second is whether the FHA issue is ripe for adjudication. *See United States v. Quinones*, 313 F.3d 49, 58 (2d Cir. 2002) (observing that "[r]ipeness is a constitutional prerequisite to the exercise of jurisdiction by the federal courts" (internal quotation marks omitted)).

With regard to the first aspect, the district court correctly noted that "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *see also Fleet Bank*, 160 F.3d at 888. Thus, the fact that the claim Clearing House is asserting might *also* serve as the basis for a defense to a potential state court action has no bearing on whether it has satisfied the well-pleaded complaint rule. *See Clearing House v. Spitzer*, 394 F. Supp. 2d at 624-25. Moreover, since Clearing House seeks to prevent the Attorney General from enforcing one federal statute (the FHA) because such enforcement would conflict with another federal statute (the NBA), the issue of whether a federal question has been presented is even more straightforward than in cases such as *Fleet Bank* and *Shaw*, which involved actions brought to

28

challenge the threatened enforcement of state laws by state officials.[11] *See id.* at 624; *see also Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 650-51 (2002) (Souter, J., concurring).

Somewhat more difficult is the issue of ripeness, which the district court did not address, but which we find necessary to consider given that the Attorney General has not yet filed a lawsuit against any national banks on the basis of the FHA. Under Article III, our jurisdiction "extend[s] to all Cases . . . [or] Controversies." U.S. Const. art. III § 2. We have observed that the purpose of the ripeness requirement is to ensure that a dispute has generated injury sufficient to satisfy the case or controversy requirement of Article III. *See Quinones*, 313 F.3d at 58 n.5. This requirement "prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d at 90.

The Supreme Court has advised that ripeness questions are "best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Whether the Attorney General may sue to enforce the FHA against national banks depends on our interpretation of that statute's grant of standing, along with our understanding of § 484(a). Those questions might be viewed as purely legal ones which would not be significantly clarified

---

[11]For the same reason, were the Attorney General to bring an action to enforce the FHA against a national bank in state court, the bank could unquestionably remove that action to federal court. *See* 28 U.S.C. § 1441; *cf. Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1 (1983).

by further factual development. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985); *Abbott Labs.*, 387 U.S. at 149.

As to the second factor, however, we have serious doubts regarding any hardship that Clearing House might suffer were we to defer consideration of this issue. If this were only a prudential matter, we might be inclined to afford greater weight to the first aspect of the ripeness inquiry. *Cf. Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 814-15 (2003) (Stevens, J., concurring). In this case, however, the question of hardship for ripeness purposes coincides with the question of whether an "imminent injury in fact" has been established for purposes of standing. *See, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 772 n.8 (2007). The latter is an independent constitutional requirement. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The district court held that Clearing House and its members had suffered injury because "[t]he threat of litigation in this case is not merely conjectural or hypothetical." *Clearing House v. Spitzer*, 394 F. Supp. 2d at 626 (citing *O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974)). Although no enforcement action has yet been filed, the district court noted the Attorney General's stated intention to file such an action in the absence of an injunction, as well as his belief that the HMDA data are sufficient to establish a *prima facie* case of racial discrimination under both federal and state fair lending laws. *See id.*

The Supreme Court has recognized that "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be

enforced." *MedImmune*, 127 S. Ct. at 772; *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (holding that where a threat of prosecution is concrete and not merely speculative, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"). However, the various factors giving rise to that principle are mostly absent here. Because Clearing House challenges the Attorney General's right to enforce the FHA against its members, but does not contest the validity of the federal statute itself or its applicability to national banks, there is no risk that the threat of enforcement would chill conduct in which the banks could otherwise legally engage. *Cf. Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478-79 (2d Cir. 1999); *St. Martin's Press, Inc. v. Carey*, 605 F.2d 41, 44 (2d Cir. 1979).

Nor are Clearing House's members faced with the dilemma confronted in *Ex Parte Young*, 209 U.S. 123 (1908), where to test the validity of an allegedly unconstitutional state regulation, the company would have been required to find an agent or employee to disobey the regulation at the risk of a fine or imprisonment. *Id*. at 145-46; *see also Yakus v. United States*, 321 U.S. 414, 437-38 (1944). Nor is this a situation in which compliance with a challenged law, prior to its enforcement, would force Clearing House's members to incur immediate expenses, make changes in their daily activity, or otherwise would affect their "primary conduct." *Cf. Nat'l Park Hospitality Ass'n*, 538 U.S. at 810; *Abbott Labs.*, 387 U.S. at 152-53. As we have already emphasized, Clearing House and its members are required to abide by the fair lending provisions of the FHA regardless of whether the New York Attorney General has the authority to enforce those provisions.

31

Finally, we see no risk that, in the absence of an injunction, the Attorney General will continue to investigate Clearing House's members prior to filing an enforcement action. Under state law, the Attorney General has broad authority to investigate illegality as well as the power to issue subpoenas. McKinney's Exec. Law § 63(12); *see OCC v. Spitzer*, 396 F. Supp. 2d at 388. No analogous pre-enforcement mechanism exists under the FHA, however, and the Attorney General does not contend otherwise. Should the Attorney General ultimately decide to pursue an action to enforce the federal statute, Clearing House could assert its objection immediately before a court, without subjecting itself to any punitive consequences.

For similar reasons, we see no contradiction between our decision to affirm the relief granted by the district court in *OCC v. Spitzer* and our determination that the FHA claim at issue is not ripe for adjudication. Although the Attorney General had not filed a lawsuit to enforce Executive Law § 296-a, the threat that he might do so became imminent when he issued letters of inquiry to the banks and their subsidiaries. Those letters – in which the Attorney General threatened to invoke his subpoena power – required the banks to take affirmative steps in response or else risk finding themselves in violation of state law, despite their belief that the Attorney General's authority to enforce such law was federally preempted. Here, by contrast, the Attorney General never mentioned the FHA until after Clearing House filed this action. The Attorney General's mere assertion, made during trial, that he had the authority to bring a *parens patriae* action under the FHA did not result in any direct or immediate consequences and did not require Clearing House's members to alter their "primary conduct" in any way that would affect our ripeness analysis.

Because it was unripe, the district court lacked jurisdiction over Clearing House's claim regarding enforcement of the FHA. We therefore vacate the injunction against the Attorney General's enforcement of the FHA and remand the case to the district court to dismiss that claim. Prudential considerations also weigh in favor of this result. Despite the Attorney General's stated intentions at the outset of the litigation, it is not certain that he will file an enforcement action under the FHA against national banks now or in the foreseeable future. Since it is unclear what the precise contours of such an action would be, we are neither sure of the exact harm that might be alleged nor of the relief that might be sought.

Moreover, this Court has never had occasion to address the underlying question of whether a state attorney general has standing to sue as *parens patriae* under the FHA. *Cf. Support Ministries for Pers. With AIDS, Inc. v. Vill. of Waterford*, 799 F. Supp. 272, 279 (N.D.N.Y. 1992) (concluding that New York State had *parens patriae* standing to maintain a suit under the FHA); *Hous. Auth. of the Kaw Tribe of Indians of Okla. v. City of Ponca*, 952 F.2d 1183, 1195 (10th Cir. 1991) (holding that a state housing authority could be considered a "person" for purposes of standing under the FHA). Though we do not believe it would be appropriate to do so in the first instance on the basis of the hypothetical action posited in this case, we note that both Congress and the Supreme Court have made clear that standing to sue under the FHA is extraordinarily permissive. *See infra.* As a result, the question of whether the NBA precludes state attorneys general from seeking to enforce the FHA against national banks is significantly more complicated than the district court's analysis suggests.

The FHA includes a broad remedial provision that allows any "aggrieved person" to bring

33

an action in district court on the basis of a discriminatory housing practice. 42 U.S.C. § 3613(a)(1)(A). The Supreme Court has interpreted the language of this provision as evincing "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (internal quotation marks omitted); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that a non-profit organization had standing to sue under the FHA); *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 109-11 (1979) (holding that a municipality had standing to sue as an aggrieved person under the FHA, and reiterating *Trafficante*'s broad interpretation of standing under the statute).[12] Congress itself "reaffirm[ed] the broad holdings of these cases" when it adopted amendments to the FHA in 1988. H.R. Rep. No. 100-711, at 23 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 2173, 2184 (citing *Havens Realty* and *Gladstone*). As the district court recognized, we have generally interpreted such broad grants of standing as reflecting "Congressional intent to permit states to enforce the rights protected by federal statutes through *parents patriae* actions." *Clearing House v. Spitzer*, 394 F. Supp. 2d at 628 (citing *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 121 (2d Cir. 2002)). In light of these powerful indicators that Congress intended expansive standing to enforce the FHA, we are reluctant to consider arguments for restricting that standing on the basis of what is at best an

---

[12]At trial, the Attorney General maintained that he would have standing to sue under the FHA as an aggrieved person, based on the State's proprietary interests, as well as in a *parens patriae* capacity. Both Clearing House and the OCC agreed below that such a proprietary claim was not ripe, and the district court declined to consider it because it was "conjectural." *Clearing House v. Spitzer*, 394 F. Supp. 2d at 627 n.1. The Attorney General has not sought to revive this claim on appeal, and so we likewise decline to address it here.

incomplete record.

*    *    *

For the foregoing reasons, we AFFIRM the district court's judgment in *OCC v. Spitzer*. We AFFIRM in part and VACATE in part the district court's separate judgment in *Clearing House v. Spitzer*, and we REMAND with instructions for the district court to dismiss the Fair Housing Act claim for lack of subject matter jurisdiction.

CARDAMONE, <u>Circuit Judge</u>, *Concurring in part, and dissenting in part*:

By proscribing the enforcement of nonpreempted state law against national banks the Office of the Comptroller of the Currency, a bureau within the U.S. Treasury Department, has altered the compact between the state and national governments. That compact crafted by the framers of our Constitution envisioning two independent co-existing sovereigns will be dangerously weakened should this action by the Executive branch stand. A co-equal relationship between the two sovereigns was built into the frame of our republican form of government. Changing that status to one more akin to parent-child or employer-employee tips the federalism scales and strips the states of a portion of the residual sovereignty granted them under the Tenth Amendment by casting the states into a permanent junior or inferior position vis-à-vis the national government. Thus, if the power to alter the relationship between the state and federal government is established, it portends the power to destroy the constitutional concept of federalism, an indispensable component of our free society.

This case arose when the Attorney General of New York discovered significant disparities based on race in interest

36

rates charged by some national banks and their state chartered subsidiaries operating in New York. He found, for example, minority borrowers at Wells Fargo Bank, J.P. Morgan Chase, Citigroup and HSBC paid higher rates of interest for mortgage loans than did white borrowers. If discrimination is proved, such conduct violates New York and federal law. Accordingly, the Attorney General launched an investigation into these banks' predatory practices. Plaintiffs the Clearing House Association, L.L.C. (Clearing House) and the Office of the Comptroller of the Currency (Comptroller or OCC) moved to enjoin the state Attorney General and obtained a trial on the merits in the United States District Court for the Southern District of New York (Stein, J.), at the conclusion of which Judge Stein ruled the Attorney General could not enforce New York's nonpreempted laws against a national bank. This ruling and the permanent injunction the district court later issued prompted the present appeal.

With respect to the majority's view of this appeal, I agree with my colleagues that we lack subject matter jurisdiction to review the Fair Housing Act issue in Clearing House Ass'n, L.L.C. v. Spitzer (Clearing House v. Spitzer), 394 F. Supp. 2d 620 (S.D.N.Y. 2005), and I concur in a remand. But, I respectfully

37

dissent from that portion of the majority opinion affirming in part the district court's judgment in Clearing House v. Spitzer and affirming the court's separate judgment in Office of the Comptroller of the Currency v. Spitzer (OCC v. Spitzer), 396 F. Supp. 2d 383 (S.D.N.Y. 2005). I do not believe Chevron deference is due to the promulgation by the OCC of 12 C.F.R. § 7.4000 barring New York State from enforcing its civil rights laws in this case.

## DISCUSSION

### I  Federalism

A principal issue on this appeal is federalism, which is focused on the tension that exists, as here, when a state law and a federal regulation conflict. Federalism is built into the structure of our Constitution that establishes a system of dual sovereigns, that is, the state and the federal government. In the felicitous words of Chief Justice Salmon Chase, "The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." Texas v. White, 74 U.S. (7 Wall.) 700, 725 (1868). As James Madison, the father of the Constitution, wrote in an essay in support of the Constitution's adoption

38

> The powers delegated by the proposed
> Constitution to the federal government are
> few and defined.  Those which are to remain
> in the State governments are numerous and
> indefinite. . . . The powers reserved to the
> several States will extend to all the objects
> which, in the ordinary course of affairs;
> concern the lives, liberties, and properties
> of the people, and the internal order,
> improvement, and prosperity of the State.

The Federalist No. 45, at 303 (James Madison) (Sesquicentennial ed., 1937).

At the adoption of the Bill of Rights, the Tenth Amendment enshrined the concept of federalism:  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  The Supreme Court believes that one of the great benefits of the federalist system is that it serves as a built in check on abuses of governmental power by a state or by the federal government, so long as there is a "healthy balance of power" between them.  Gregory v. Ashcroft, 501 U.S. 452, 458 (1991).  The framers recognized that whatever state powers were surrendered to the new federal government, they were limited so as to be with respect to "certain enumerated objects only"; the states retained "a residuary and inviolable

39

sovereignty over all other objects."  The Federalist No. 39, at 249 (James Madison).  Federalism assumes the state and federal governments have concurrent authority over the people, Printz v. United States, 521 U.S. 898, 919-20 (1997).  Hence, in Printz the Supreme Court ruled it unconstitutional for Congress to commandeer the chief law enforcement officer of each local jurisdiction to conduct background checks of prospective handgun purchasers under the Brady Act.  Such a command under the Act, the High Court ruled, violates states' residual sovereignty by compelling them to administer a federal regulatory program.  Id. at 932-33.

In the case at hand, we do not have the federal government compelling the states to take some action.  Instead, we have a federal executive official -- the Comptroller of the Currency -- usurping "residual power reserved to the states."  Here, the power usurped is the police power to investigate certain national banks and their operating subsidiaries doing business in New York allegedly guilty of discriminatory lending practices in the state.

In discussing federalism in United States v. Lopez, 514 U.S. 549 (1995), the Supreme Court observed the healthy balance

40

between state and federal sovereignties is an obligation of all government officials.  Id. at 578.  It is so vital in preserving our freedom that a court should not refuse to intervene when the federal or state government has "tipped the scales too far."  Id. The record on this appeal reveals that an administrative official in the Executive branch -- not Congress -- has tipped the scales too far, which should in my view prompt us to intervene.

## II  Visitorial Power Under the National Bank Act

### A.  National Bank Act

I turn now to the statutory backdrop for this litigation. The National Bank Act, 12 U.S.C. § 21 et seq. (2001), first enacted in 1863 and reenacted in 1864, provides for the formation and regulation of national banks.  See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 449 (1993). Rather than displacing the state banking system, the National Bank Act established what has come to be known as the dual banking system, in which federal and state chartered banks coexist in relative "competitive equality."  See generally First Nat'l Bank in Plant City v. Dickinson, 396 U.S. 122, 131-33 (1969).  National banks are federal instrumentalities, in that they are organized and exist under the laws of the United States,

41

but they are also privately owned businesses headquartered in a particular state and, in general, subject to the laws of that state. See Nat'l Bank v. Commonwealth, 76 U.S. (9 Wall.) 353, 361-62 (1869); Guthrie v. Harkness, 199 U.S. 148, 157 (1905); Keith R. Fisher, Toward a Basal Tenth Amendment:  A Riposte to National Bank Preemption of State Consumer Protection Laws, 29 Harv. J.L. & Pub. Pol'y 981, 1002-03 (2006).

### B.  Visitorial Power

Section 484 of the National Bank Act provides that

> [n]o national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

12 U.S.C. § 484(a) (2001).  Whether New York State is attempting to exercise "visitorial powers" over national banks is a matter of controversy in this case.  The American legal scholar Roscoe Pound traced the history of visitorial jurisdiction, beginning with canon law, from which the concept originated, when visitations by bishops to parishes took place to remedy abuses and to make sure church matters were handled decently and in order.  In the common law America inherited from England all

42

corporations are subject to visitation to ensure their abiding by the purposes of the charter that created them.  Roscoe Pound, Visitatorial Jurisdiction over Corporations in Equity, 49 Harv. L. Rev. 369 (1936).

Early interpretations of the term emphasized the supervisory nature of visitorial authority.  See, e.g., First Nat'l Bank of Youngstown v. Hughes, 6 F. 737, 740 (6th Cir. 1881), appeal dismissed, 106 U.S. 523 (1883).  In Guthrie, the Supreme Court explained that visitation is the "act of a superior or superintending officer, who visits a corporation to examine into its manner to conducting business, and enforce an observance of its laws and regulations."  199 U.S. at 158; see also Watters v. Wachovia Bank, N.A., 127 S. Ct. 1559, 1568 (2007) (same).

The state Attorney General has not expressed an interest in analyzing national banks' activities under their national banking charter, but instead is exercising his authority under the state's police power to investigate civil rights violations being committed by New York entities in New York.  In response to troubling indicia of discrimination in the terms of mortgages issued in New York, see generally Manny Fernandez, Racial Disparity Found Among New Yorkers with High-Rate Mortgages, N.Y.

43

Times, Oct. 15, 2007, at B1, the Attorney General asserts his right to conduct reasonable investigations of national banks -- just as he does of other citizens located in New York -- as part of his duty to enforce a state law of general application. Under § 296-a of New York's Human Rights Law it is an unlawful discriminatory practice for a bank to discriminate against an applicant for credit because of the applicant's "race, creed, color, national origin, . . ." N.Y. Exec. Law § 296-a (McKinney 2005). The statute expressly states the Human Rights Law "shall be deemed an exercise of the police power of the state" to protect "the public welfare, health and peace of the people of this state." Id. § 290(2).

### C. Authority of States to Enforce Nonpreempted State Laws Against National Banks

While the precise contours of the term "visitorial powers" in the national banking context have not been fully delineated, it is clear that virtually from the inception of the National Bank Act the term was not understood to preclude state enforcement of nonpreempted state laws. See Waite v. Dowley, 94 U.S. 527, 528, 534 (1876) (affirming, in suit brought by town treasurer, state court judgment imposing penalty on national bank

cashier for failing to comply with state law).

Considerable authority supports the proposition that states have the authority to enforce such laws against national banks. For example, the Supreme Court held in 1924 that the National Bank Act did not impede the ability of a state attorney general to bring an action against a national bank to enforce a valid state law prohibiting the establishment of branch banks. First Nat'l Bank in St. Louis v. Missouri, 263 U.S. 640, 659-60 (1924); see also First Nat'l Bank of Bay City v. Fellows, 244 U.S. 416, 421-22 (1917) (considering and denying on merits state attorney general's quo warranto action testing authority of national bank to engage in trust services under state and federal law); Minn. v. Fleet Mortgage Corp., 158 F. Supp. 2d 962, 966 (D. Minn. 2001) (holding that state could bring action to enforce state fraud and deceptive trade practice laws against national bank); Alaska v. First Nat'l Bank of Anchorage, 660 P.2d 406, 425-26 (Alaska 1982) (holding that state could sue national bank to enforce state consumer protection laws); Peoples Savs. Bank v. Stoddard, 102 N.W.2d 777, 782, 796-97 (Mich. 1960) (applying, in suit brought by state attorney general, state antitrust law to national bank); cf. Dickinson, 396 U.S. at 129, 130, 138 (denying declaratory and

45

injunctive relief to national banking association following state comptroller's letter requesting national bank to cease and desist activities prohibited by state law and incorporated into federal law under 12 U.S.C. § 36(c)); Brown v. Clarke, 878 F.2d 627, 629, 632 (2d Cir. 1989) (affirming, in suit brought by state banking commissioner, judgment barring national bank from engaging in branching activity prohibited by state law and incorporated into federal law under 12 U.S.C. § 36(c)); Utah ex rel. Dep't of Fin. Insts. v. Zions First Nat'l Bank of Ogden, 615 F.2d 903, 904, 906 (10th Cir. 1980) (same); Nuesse v. Camp, 385 F.2d 694, 700 (D.C. Cir. 1967) (finding state banking commissioner could intervene in suit to enjoin Comptroller of Currency from authorizing national bank to open branch in contravention of state law as incorporated into federal law under 12 U.S.C. § 36(c)); Jackson v. First Nat'l Bank of Valdosta, 349 F.2d 71, 75 (5th Cir. 1965) ("[W]here there is authority to proceed against national banking associations, even if in terms it is only authority to proceed against violations of state law, the subsumption of state substantive law as the regulating principle for national banking associations concerning branching carries with it the right of the State Superintendent of Banks to see to it that that substantive law is

46

enforced.").

Not only have federal and state courts repeatedly affirmed the authority of states to enforce nonpreempted state law against national banks, Congress has also emphasized the importance of the dual banking system generally and, more specifically, the importance of the ordinary application of state laws to national banks. When Congress enacted the Riegle-Neal Interstate Banking and Branching Efficiency Act in 1994, it specifically subjected interstate branches of national banks to the laws of their host states in the areas of community reinvestment, consumer protection, fair lending, and intrastate branching. See 12 U.S.C. § 36(f) (2001). The House Conference Report stated that

> States have a strong interest in the activities and operations of depository institutions doing business within their jurisdictions, regardless of the type of charter an institution holds. In particular, States have a legitimate interest in protecting the rights of their consumers, businesses, and communities. . . . Congress does not intend that the Interstate Banking and Branching Efficiency Act of 1994 alter this balance and thereby weaken States' authority to protect the interests of their consumers, businesses, or communities.

H.R. Rep. No. 103-651, at 53 (1994), as reprinted in 1994 U.S.C.C.A.N. 2068, 2074.

47

III   Section 7.4000 is Not Entitled to <u>Chevron</u> Deference

A.   <u>Action of the OCC</u>

It is against this statutory and case law background that, in 1999, the Comptroller issued a revised regulation interpreting § 484's prohibition on the exercise of visitorial powers over national banks to preclude states from enforcing in court nonpreempted state laws.  12 C.F.R. § 7.4000.  Rather than preempting state law, § 7.4000 preempts the ability of a state government to enforce concededly nonpreempted state law.  By limiting the power of the state to enforce applicable state law and vesting that authority in a federal agency under § 7.4000, the usual constitutional balance of power between the states and the federal government is heavily tilted towards the federal government, and the Tenth Amendment is put in peril.  Because there is no evidence that Congress planned for such a shift to occur, § 7.4000 must be set aside.

B.  <u>Regulation Not Authorized Under the Supremacy Clause</u>

To avoid facing the conflict this regulation poses to the balance crafted by the Tenth Amendment, the majority applies to § 7.4000 the deferential review laid out in <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984).  The

48

majority's apparent assumption is that a federal regulation preempting a state's ability to _enforce_ state law is no more troubling or problematic than a regulation substantively preempting state law.  I strongly disagree.  By leaving state substantive law in place, while at the same time denying the state any role in enforcing that law, § 7.4000 erodes a key aspect of state sovereignty, confuses the paths of political accountability, and allows a federal regulatory agency to have a substantial role in shaping state public policy.  The likely result of which is a plain transgression on our republican form of government and a violation of the Tenth Amendment.

Further and significantly, the Supremacy Clause in article VI, clause 2 grants the power to preempt state law to the Congress, not to appointed officials in the Executive branch. Even when there is preemption by a federal agency, it may only occur within the scope of authority unmistakably delegated to it by Congress.  Such authority does not exist here.  In such cases, it is well established that an agency's construction of a statute that upsets the usual constitutional balance between federal and state powers is never entitled to deferential review under Chevron.  See Solid Waste Agency of N. Cook County v. U.S. Army

49

Corps of Eng'rs, 531 U.S. 159, 172 (2001).  Instead, the courts

require a clear indication that Congress intended that result.

Id.  The requirement for a clear expression of congressional

intent

> . . . stems from our prudential desire not to
> needlessly reach constitutional issues and
> our assumption that Congress does not
> casually authorize administrative agencies to
> interpret a statute to push the limit of
> congressional authority.  This concern is
> heightened where the administrative
> interpretation alters the federal-state
> framework by permitting federal encroachment
> upon a traditional state power.

Id. at 172-73; see also Gregory, 501 U.S. at 460-61 ("If Congress

intends to alter the usual constitutional balance between the

States and the Federal Government, it must make its intention to

do so unmistakably clear in the language of the statute.").

C.  Law Enforcement Core Aspect of State Sovereignty

It is difficult to imagine a more core aspect of state

sovereignty than the authority to pass and enforce valid

nonpreempted state laws.  "[T]he power to create and enforce a

legal code, both civil and criminal is one of the quintessential

functions of a State."  Diamond v. Charles, 476 U.S. 54, 65

(1986).  The Supreme Court has repeatedly emphasized that states'

50

ability to pass and enforce their own laws is an essential attribute of state sovereignty. See, e.g., United States v. Wheeler, 435 U.S. 313, 320 (1978) ("Each [state] has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses."); cf. Calderon v. Thompson, 523 U.S. 538, 556 (1998) ("Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power of a State to pass laws means little if the State cannot enforce them.").

In criminal law, the doctrine of dual sovereignty has evolved to protect the substantial state interest in the enforcement of its criminal code. The Supreme Court has explained that separate federal and state prosecutions for the same unlawful act do not offend the Double Jeopardy Clause because "[f]oremost among the prerogatives of sovereignty is the power to create and enforce a criminal code" and "[a] State's interest in vindicating its sovereign authority through enforcement of its laws by definition can never be satisfied by another State's enforcement of its own laws." Heath v. Alabama, 474 U.S. 82, 93 (1985); see also Bartkus v. Illinois, 359 U.S.

51

121, 137 (1959) (holding that a federal prosecution cannot "displace the reserved power of States over state offenses" and that the opposite result "would be in derogation of our federal system").

### D.  St. Louis v. Missouri

But it is not necessary to turn to the constitutional principles underlying the dual sovereignty doctrine to demonstrate that nonpreempted state laws may be enforced by a state against national banks.  The Supreme Court has addressed this precise issue in a precedent that is now over eighty years old.  In St. Louis, the attorney general of Missouri brought a quo warranto proceeding in Missouri state court against a national bank alleging that the bank had violated a state law prohibiting the establishment of branch banks.  263 U.S. at 655. The national bank responded by asserting, inter alia, that, even if the state statute could be validly applied to a national bank, the state could not maintain a proceeding in court to enforce it. Id. at 655, 660.  The Supreme Court soundly rejected this argument, stating

> . . . since the sanction behind [the state
> statute] is that of the State and not that of
> the National Government, the power of

> enforcement must rest with the former and not with the latter. To demonstrate the binding quality of a statute but deny the power of enforcement involves a fallacy made apparent by the mere statement of the proposition, for such power is essentially inherent in the very conception of law.

Id. at 660.

The majority's attempts to distinguish St. Louis are unavailing. Although St. Louis did not discuss the term "visitorial powers" by name, the result in that case would have been logically impossible were the OCC's interpretation of the term correct. In affirming Missouri's authority to enforce valid state laws against a national bank, the Supreme Court in St. Louis drew a distinction between permissible state action "to vindicate and enforce its own law," on the one hand, and impermissible state action to "enforce a law of the United States" or "call the bank to account for an act in excess of its charter powers," on the other. Id. It is no coincidence that the state actions that the St. Louis Court indicated would be impermissible under the National Bank Act -- actions to ensure that a national bank is complying with its charter or the law of its creation -- line up precisely with the definition of "visitorial power" provided by the Court in Guthrie. See

53

<u>Guthrie</u>, 199 U.S. at 158 (explaining visitation).

### E. <u>Traditional Federal-State Balance Upset</u>

Not only does § 7.4000 upset the traditional federal-state balance by intruding upon a core state function, but it does so in a way that potentially blurs the distinct lines of political accountability between citizens and the federal and state governments.

> The theory that two governments accord more liberty than one requires for its realization two distinct and discernable lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States. If . . . the Federal and State Governments are to control each other, and hold each other in check by competing for the affections of the people, those citizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function.

<u>Lopez</u>, 514 U.S. at 576-77 (Kennedy, J., concurring). By keeping state law in effect, but removing from state executives the power to enforce that law in court, § 7.4000 confuses which governmental entity citizens should hold accountable for the enforcement of state laws against national banks. If the OCC fails adequately to enforce state law against national banks, state officials could bear the brunt of public disapproval while

54

federal officials remain insulated from the electoral ramifications of their enforcement policies.  Cf. New York v. United States, 505 U.S. 144, 169 (1992) (raising parallel concern in context of federal legislation compelling states to regulate disposal of radioactive waste).  "Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not preempted by federal regulation."  Id.

Similarly, the federal government is unlikely to be as motivated or as effective as the states in responding to the complaints of a particular state's citizenry regarding the enforcement of that state's laws.  Here, amici for appellant echo numerous state officials, consumer groups and academic authors in expressing concern that the OCC may lack the capability and commitment to protect consumers with the vigor applied by state attorneys in the past.  See, e.g., U.S. Gen. Accounting Office, OCC Consumer Assistance:  Process is Similar to That of Other Regulators but Could be Improved by Enhanced Outreach 23-24 (2006) (noting concerns of local officials and consumer group representatives); Fisher, supra, at 1006 (commenting on state officials' proactive enforcement of consumer protection statutes

in cases that federal agencies were "unable or unwilling" to pursue).

Perhaps of most concern is the role § 7.4000 gives to a federal agency in shaping state policy. While the regulation does not mandate that a state legislature institute a particular regulatory regime, there is no doubt that the ultimate contours of state policies will be shaped by the decisions the OCC makes regarding how to -- and how not to -- enforce state laws against national banks. As the Supreme Court has observed, "[e]xecutive action that has utterly no policymaking component is rare." Printz, 521 U.S. at 927.

In light of the implications that § 7.4000 has for state sovereignty and the core state function of the enforcement of valid state law, a clear statement of congressional purpose to do so is necessary to support the OCC's interpretation of the term visitorial powers. Because Congress has provided no such indication, the regulation should be set aside and the district court's judgments in OCC v. Spitzer, supra, and Clearing House v. Spitzer, supra, vacated.

### IV Watters Decision

Finally, the Supreme Court's recent decision in Watters does

56

not lead to a contrary result.  In Watters, the Supreme Court confronted the question of whether a state can exercise visitorial powers over national bank operating subsidiaries.  127 S. Ct. at 1564.  There was no question that the state statute at issue in that case constituted an exercise of visitorial power over such subsidiaries.  Id.  The statute attempted to empower the state banking commissioner with general supervision and control over the operating subsidiaries and subjected them to various licensing, registration, and inspection requirements. Id. at 1565-66.  In finding that the National Bank Act's prohibition on the exercise of visitorial powers applied to national bank subsidiaries to the same extent that it applied to national banks, Watters reaffirmed the basic principle that "when state prescriptions significantly impair the exercise of [the national bank's] authority, enumerated or incidental under the NBA, the State's regulations must give way."  Id. at 1567.

Watters thus concerned the relatively familiar case in which a state statute was substantively preempted by federal law.  The questions raised by the regulation at issue in this case are very different.  Here, there is no dispute that Congress could -- but has chosen not to -- preempt the state law that the New York

57

Attorney General is attempting to enforce. The crucial question is rather whether the OCC can interpret the National Bank Act to limit state regulation of national banks <u>in this way</u>. This case calls on this Court to determine whether Congress aimed to vest the enforcement of valid state law against national banks entirely in the hands of a federal agency. As the majority concedes, <u>Watters</u> had no occasion to address directly this unique and complex question.

CONCLUSION

Accordingly, for the reasons stated above, § 7.4000 should be set aside and <u>OCC v. Spitzer</u>, <u>supra</u>, and <u>Clearing House v. Spitzer</u>, <u>supra</u>, vacated. Thus, while I concur in the majority's determination that the Fair Housing Act claim in <u>Clearing House v. Spitzer</u>, should be dismissed, I respectfully dissent from that part of the majority's decision that affirms the district court judgments.