**CAPITAL ONE BANK (USA), N.A., et al., Plaintiffs,**

v.

**Darrell V. McGRAW, Jr., Defendant.**

**Civil Action No. 2:08–cv–00165.**

United States District Court, S.D. West Virginia, Charleston Division.

June 26, 2008.

Bruce M. Jacobs, Niall A. Paul, Spilman Thomas & Battle, Charleston, WV, James R. McGuire, Rita Lin, Morrison & Foerster, San Francisco, CA, for Plaintiffs.

Charli Fulton, Office of the Attorney General, Troy N. Giatras, The Giatras Law Firm, Charleston, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

JOSEPH R. GOODWIN, Chief Judge.

Pending before the court is the defendant's Motion to Dismiss. For reasons set forth below, the defendant's motion is **DENIED in part** and **GRANTED in part**. Because I find as a matter of law that the defendant's subpoena cannot lawfully be enforced against Capital One Bank (USA), N.A., the defendant and his agents are (1) permanently **ENJOINED** from issuing subpoenas or demanding the inspection of the books and records of Capital One Bank (USA), N.A., in connection with the defendant's investigation into credit card lending, and (2) permanently **ENJOINED** from seeking to enforce the subpoena referenced in *State of West Virginia ex rel. Darrell V. McGraw, Jr., Attorney General v. Capital One Bank*, Misc. Action No. 05–C–71 (Circuit Court of Lincoln County). Because I find that Capital One Services, Inc., is not protected by the National Bank Act, the plaintiffs' claims regarding the defendant's subpoena of Capital One Services, Inc., are **DISMISSED with prejudice**. Likewise, the plaintiffs' § 1983 claims are **DISMISSED with prejudice**.

Also pending before the court is the defendant's Motion to Unseal File for the Limited Purpose of Appointing Amicus Curiae. This motion is **DENIED as moot**.

### I. Background

#### A. Factual Background

This case arises from the West Virginia Attorney General's attempt to investigate consumer complaints regarding the activities of plaintiff Capital One Bank (USA), N.A., ("Capital One") and Capital One Services, Inc. ("COSI"). After receiving approximately 150 consumer complaints against Capital One and approximately 114 complaints against COSI, the defendant

launched an investigation of these entities. (Procedural Order 9, 18, Circuit Court of Lincoln County, Def.'s Brief Ex. 1.) The complaints included claims that (1) consumers were promised high amounts of credit that they did not receive, (2) consumers were faced with high interest rates, high late fees, and over-limit fees, (3) consumers had problems trying to settle and close their accounts, and (4) consumers who purchased a product called "The Payment Protection Plan" were not receiving the benefits for which they paid. (Procedural Order 18–19.)

As a result of these consumer complaints, the defendant served subpoenas on Capital One and COSI on April 4, 2005. At the time the defendant served the subpoenas, Capital One was a Virginia-chartered bank and COSI was a Delaware corporation. (Compl. ¶¶ 2–3.) The subpoenas, which are virtually identical, were issued to assist the defendant "in the investigation of possible unfair or deceptive acts or practices relating to marketing, advertising, servicing, including debt collection, and issuing of credit cards and related services, in violation of the West Virginia Consumer Credit and Protection Act, W. Va.Code § 46A–1–101, *et seq.*" (Capital One Subpoena, Pls.' Brief Ex. A; COSI Subpoena, Pls.' Brief Ex. B.) The subpoenas, as originally issued, request information for the time period beginning on January 1, 2001, and continuing until the plaintiffs respond. (Capital One subpoena 2.)

In the subpoenas, the defendant requests information regarding, among other things: (1) the Payment Protection Plan, (2) offers of credit made to consumers, (3) secured credit cards, (4) consumers who attempted to close a credit card but where unable to do so because of an outstanding balance, (5) fees charged in connection with credit card products, and (6) procedures for investigating consumer complaints. (Capital One Subpoena; COSI Subpoena.) The subpoenas also request the identity and account information of consumers who purchased certain products from the plaintiffs. (Capital One Subpoena; COSI Subpoena.) Finally, the subpoenas seek documents relating to the ownership and corporate structure of Capital One and COSI. (Capital One Subpoena; COSI Subpoena.)

Capital One and COSI failed to respond to the defendant's subpoenas. On May 9, 2005, the defendant filed petitions to enforce the subpoenas in the Circuit Court for Lincoln County, West Virginia. (Compl. ¶ 11.) On September 10, 2007, over two years after the defendant filed the petitions, Judge Hoke denied Capital One and COSI's motions to dismiss and granted the defendant's petitions to enforce the subpoenas. (Procedural Order 42.) Judge Hoke ordered Capital One and COSI to respond to the defendant's subpoenas within 90 days of the issuance of the order. (*Id.* at 43.) Capital One and COSI appealed Judge Hoke's order to the West Virginia Supreme Court of Appeals, and the Supreme Court of Appeals stayed the order pending its consideration of the appeal. (Compl. ¶ 4.)

On March 1, 2008, Capital One converted from a Virginia-chartered bank to "a national banking association organized under the National Bank Act." (*Id.* ¶ 12.) On March 7, 2008, Capital One and COSI, which remained a Delaware corporation, notified the defendant of Capital One's conversion to a national bank. (*Id.* ¶ 13.) The plaintiffs requested that in light of this conversion, the defendant withdraw its subpoenas. (*Id.*; Conversion Letter, Compl. Ex. A.) The defendant refused. (Compl. ¶ 14.)

## B. Procedural Background

On March 13, 2008, the plaintiffs filed the present suit. The plaintiffs seek a declaration that the defendant and his agents may not enforce the subpoenas against the plaintiffs, pursue the state-court action for enforcement of the subpoenas, or otherwise investigate or sue Capital One or COSI regarding banking activities. (*Id.* ¶¶ 29–31.) The plaintiffs also seek an injunction requiring the defendant to dismiss the state-court action for enforcement of the subpoenas and preventing them from attempting to investigate or sue Capital One and COSI regarding banking activities. (*Id.* ¶¶ 15–28.) Finally, the plaintiffs seek injunctive and declaratory relief under 42 U.S.C. § 1983. The court has subject-matter jurisdiction under 28 U.S.C. § 1331.

On March 18, 2008, I ordered the parties to brief (1) whether, by seeking to enforce its subpoenas, the defendant is exercising "visitorial powers" as that term is defined in 12 U.S.C. § 484(a); and (2) whether subpoening COSI in this case hampers the federally authorized activities of a national bank. The parties briefed those issues as ordered. On April 8, 2008, the defendant filed a motion to dismiss based on Rule 12(b)(6) of the Federal Rules of Civil Procedure. On May 6, 2008, the defendant advised that it amended the subpoena issued against Capital One cover only the time period before Capital One became a national bank. (Def.'s Reply 1.)

## II. Discussion

In support of its motion to dismiss, the defendant makes four arguments. First, the defendant argues that by subpoening Capital One and COSI, it is not exercising any "visitorial power," and thus 12 U.S.C. § 484(a) does not bar its investigation. Second, the defendant argues that because the subpoena against Capital One is now limited to the time period before Capital One became a national bank, the defendant's enforcement of the subpoena does not implicate any visitorial powers. The defendant also asserts that because COSI is neither a national bank nor an operating subsidiary of a national bank, the National Bank Act ("NBA"), 12 U.S.C. § 1 *et seq.*, does not shield COSI from the defendant's investigation. Finally, the defendant contends that the NBA does not provide national banks with rights enforceable under 42 U.S.C. § 1983.

## A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move for dismissal based on the plaintiff having "fail[ed] to state a claim upon which relief can be granted." "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," not "resolve contests surrounding the facts or merits of a claim." *Smith v. Frye*, 488 F.3d 263, 274 (4th Cir.2007) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.1999)). In addressing a 12(b)(6) motion, a court will construe the factual allegations in the light most favorable to the nonmoving party and accept them as true, but it is not so bound with respect to the complaint's legal conclusions. *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007). A complaint will survive a 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face," but the complaint must consist of "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1974, 1964–65.

## B. Visitorial Powers

The NBA was designed to create a banking system "extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and numerous as the states." *Easton v. Iowa*, 188 U.S. 220, 229, 23 S.Ct. 288, 47 L.Ed. 452 (1903). To protect this independence, the NBA provides that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized." 12 U.S.C. § 484(a). In 12 C.F.R. § 7.4000(a)(1) the Office of Comptroller of Currency ("OCC") explains that because of § 484(a), "[o]nly the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks." The regulation also provides examples state activities that are considered visitorial.[1] 12 C.F.R. § 7.4000(a)(2).

It is undisputed that Capital One is a national bank. Thus, whether the defendant can enforce the subpoena against Capital One turns on whether he is exercising visitorial power. The NBA does not define "visitorial" or "visitation." The Supreme Court defines "visitation" as "the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce an observance of its laws and regulations." *Watters v. Wachovia Bank, N.A.*, ── U.S. ──, 127 S.Ct. 1559, 1568, 167 L.Ed.2d 389 (2007). According to the OCC's "visitorial powers" regulation, "[s]tate officials may not exercise visitorial

powers with respect to national banks, such as conducting examinations, inspecting or requiring the production of books or records of national banks, or prosecuting enforcement actions, except in limited circumstances authorized by federal law." 12 C.F.R. § 7.4000(a)(1). Examples of visitorial powers include: "(i) Examination of a bank; (ii) Inspection of a bank's books and records; (iii) Regulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv) Enforcing compliance with any applicable federal or state laws concerning those activities." 12 C.F.R. § 7.4000(a)(2). On the other hand, the OCC regulations also provide that "production of a bank's records ... may be required under normal judicial procedures." 12 C.F.R. § 7.4000(a)(1).

■ Applying these definitions, it is clear that the defendant, in subpoening Capital One and COSI and seeking to enforce the subpoenas, is attempting to exercise visitorial power. Under the federal regulations, state officials, such as the defendant, cannot inspect or require the production of books or records of a national bank. The defendant's subpoena and petition for enforcement of the subpoena do just that. Moreover, the NBA authorizes national banks to issue, market, and service credit cards. *See* 12 U.S.C. § 24 Seventh (stating that a national banking association may "loan[ ] money on personal security"); 12 C.F.R. § 7.4008(a) ("A national bank may make, sell, purchase, participate in, or otherwise deal in loans and interests in loans that are not secured by liens on, or interests in, real estate...."); 12 C.F.R. § 7.4008(d)(2) (stating that a national bank may make non-real estate loans without regard to state law limitations

---

**1.** There are six exceptions to the OCC's exclusive visitorial authority, none of which apply to this case. *See* 12 C.F.R. § 7.4000(b).

concerning "disclosure and advertising"). By issuing a subpoena to investigate possible deceptive marketing, servicing, and issuance of credit cards, the defendant attempts to supervise activities authorized by federal banking law, which is a "visitation" that state officials are prohibited from pursuing. 12 C.F.R. 7.4000(a)(2). Finally, state officials cannot enforce laws against national banks if those laws concern activities authorized by the NBA. 12 C.F.R. 7.4000(a)(2). The NBA authorizes national banks to extend consumer credit. The West Virginia Consumer Credit Protection Act, W. Va.Code § 46A–1–101, *et seq.*, is a state law concerning consumer credit. Thus, the defendant cannot force Capital One to comply with the Act because doing so would be exercising a visitorial power. If the defendant is prohibited from enforcing the Act against Capital One, it follows that the defendant cannot use a subpoena to investigate whether Capital One violated the Act.

This conclusion is supported by recent federal case law. In *Watters v. Wachovia Bank, N.A.,* —— U.S. ——, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007), the Supreme Court held that a national bank's mortgage business, "whether conducted by the bank itself or through the bank's operating subsidiary, is subject to OCC's superintendence and not to the licensing, reporting, and visitorial regimes of the several States in which the subsidiary operates." 127 S.Ct. 1559, 1564–65 (2007). The issue in *Watters* was whether a national bank's mortgage lending activities remained outside the governance of state licensing and auditing agencies when the activities were conducted by the bank's operating subsidiary. *Id.* at 1564. The Court noted that "[s]tate laws that conditioned national banks' real estate lending on registration with the State, and subject such lending to the State's investigative and enforcement machinery would surely interfere with the banks' federally authorized business: National banks would be subject to registration, inspection, and enforcement regimes imposed not just by Michigan, but by all States in which the banks operate." *Id.* at 1568. These statements strongly suggest that state investigations of national banks, such as the one in which the defendant is engaging, are not treated any differently under the NBA than examination of national banks by state regulatory bodies. *See Clearing House Ass'n v. Cuomo,* 510 F.3d 105, 116 (2d Cir.2007) ("[T]he Court [in *Watters* ] implied that investigation and enforcement by state officials are just as much aspects of visitorial authority as registration and other forms of administrative supervision . . . .")

The Second Circuit addressed the meaning of "visitation" in depth in *Clearing House Ass'n v. Cuomo,* 510 F.3d 105 (2d Cir.2007). There, the New York Attorney General began investigating possible racial discrimination in the residential real estate lending practices of several national banks and their operating subsidiaries. *Id.* at 109. As part of his investigation into whether the banks violated federal and state anti-discrimination law, the Attorney General sent "letters of inquiry" to national banks engaged in mortgage lending and requested that, "in lieu of issuing a formal subpoena," the lenders voluntarily produce certain non-public information and data regarding their loans. *Id.* The OCC sued to enjoin the Attorney General's investigative efforts. *Id.* at 110. The OCC argued that such efforts were "visitorial" as that term is defined in 12 C.F.R. § 7.4000(a)(2), and that as a consequence, § 484(a) of the NBA prevented the Attorney General from pursuing its investigation. *Id.* The Attorney General argued that its investigation was not a "visitation" of a national bank because the OCC's regulation that defined "visitorial," was unlawful and

should be set aside under the Administrative Procedure Act. *Id.*[2] The Attorney General also asserted that his investigation fell within § 484's exception for visitorial powers "vested in the courts of justice." *Id.* at 110, 118. Following a trial, the district court deferred to the OCC's visitorial powers regulation, held that the Attorney General's investigation was prohibited by § 484(a), and enjoined the Attorney General "from issuing subpoenas or demanding inspection of the books and records of any national banks in connection with his investigation into residential lending practices; from instituting any enforcement actions to compel compliance with the Attorney General's already existing informational demands, and from instituting actions in the courts of justice against national banks to enforce state fair lending laws." *OCC v. Spitzer,* 396 F.Supp.2d 383, 407–08 (S.D.N.Y.2005).

The Second Circuit affirmed the declaratory and injunctive relief ordered by the district court. *Clearing House Ass'n,* 510 F.3d at 121. The court first held that in reviewing the OCC's interpretation of § 484(a), it was required to apply *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Id.* at 114. Applying the *Chevron* framework, the court first held that the NBA does not clearly preclude the OCC's interpretation of § 484(a), as set forth in the OCC's visitorial powers regulation, 12 C.F.R. § 7.4000(a). *Id.* at 117. According to the Second Circuit, the premise of the majority opinion in *Watters* was that "enforcement of a state law purporting to regulate a national bank's exercise of the powers it has been granted under the NBA may constitute a prohibited visitation under § 484(a) whether or not

the law itself directly conflicts with a federal statute or regulation." *Id.* at 116. The court concluded that "[i]t seems clear to us, after *Watters,* that investigative and enforcement powers of the type the Attorney General has sought to exercise here are at least in some sense 'visitorial,' whether or not they unambiguously fall within the scope of § 484(a)." *Id.* at 117.

The court in *Clearing House Ass'n* then turned to the second step of *Chevron,* which asks whether the OCC's interpretation of § 484(a) is based on a permissible construction of that statute. *Id.* at 117–18. The court found that the OCC's visitorial powers regulation furthered Congress's intent "to shield national banks 'from unduly burdensome and duplicative state regulation' in the exercise of their federally authorized powers." *Id.* at 120 (citing *Watters,* 127 S.Ct. at 1567). "At the same time, it preserves state sovereignty by leaving state officials free to enforce a wide range of laws that do not purport to regulate a national bank's exercise of its authorized banking powers, as well as by not preempting state laws ... that do not directly conflict with such powers." *Id.* For these and other reasons, the court held that 12 C.F.R. § 7.4000(a) was a permissible construction of the statute. *Id.* at 120. The court therefore held that the district court was correct to apply the regulation and enjoin the Attorney General's investigation. *Id.* at 121.

There is little difference between what the defendant is trying to do in this case and what the New York Attorney General was prevented from doing in *Clearing House Ass'n.* In both cases a state attorney general is attempting to investigate a national bank's exercise of its federally authorized powers. In *Clearing House*

---

**2.** The Attorney General conceded that "if the OCC's regulation is upheld, it would bar his investigation and threatened enforcement ac-

tion." *Clearing House Ass'n,* 510 F.3d at 114 n. 6.

*Ass'n*, the federally authorized power was real estate lending. Here, it is credit card lending. Moreover, the Attorney General in *Clearing House Ass'n* merely sent letters in lieu of subpoenas, whereas the defendant here has gone even further and actually issued subpoenas. Thus, *Clearing House Ass'n* supports the court's determination that by issuing its subpoenas to investigate Capital One's credit card activities, the defendant was exercising visitorial powers.

Unlike New York Attorney General, however, the defendant does not challenge the OCC's "visitorial powers" regulation, despite the fact that it, along with § 484(a), precludes the defendant from investigating Capital One. Instead, the defendant cites cases that pre-date the OCC's visitorial powers regulation, which was enacted in 1996. These cases are distinguishable from the present case. In *Peoples Bank of Danville v. Williams*, 449 F.Supp. 254 (W.D.Va.1978), the SEC served investigative subpoenas on a bank in order to determine whether it violated the anti-fraud provisions of the Securities Exchange Act. 449 F.Supp. at 255–57. The district court held that the SEC's investigation was not a visitorial power within the meaning of § 484. *Id.* at 260. The court reasoned that the SEC's inquiry did not contemplate inspection, supervision, or regulation of People's Bank, but rather only sought to determine whether securities laws had been violated. *Id. Peoples Bank* is not, of course, binding on this court. Moreover, its persuasive appeal is diminished because People's Bank was not a national bank; it was a state-chartered bank. *Id.* at 256. Perhaps more importantly, *Peoples Bank* was decided before the OCC issued its visitorial powers regulation.

The other cases cited by the defendant are not helpful. *Guthrie v. Harkness*, 199 U.S. 148, 26 S.Ct. 4, 50 L.Ed. 130 (1905), and *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032 (9th Cir.2008), both involved suits by private individuals. This is significant because "the exclusivity of visitorial authority preempts only enforcement of state visitation laws by state officials." *Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 964 (9th Cir.2005); *Bank of Am., N.A. v. Miller*, Case No. CIV S–06–1971, 2007 WL 184804, at *4 (E.D.Cal. Jan. 19, 2007) (" '[V]isitorial powers' (within the meaning of the visitorial statute) can only be exercised by state officials, not private parties."). The holding of *State v. First Nat'l Bank of Portland*, 61 Or. 551, 123 P. 712 (1912)—that a state proceeding to escheat to the state unclaimed bank deposits is not visitorial—has been incorporated into the OCC's regulation. *See* 12 C.F.R. § 7.4000(b)(1)(ii).

The defendant does not ignore the OCC's visitorial powers regulation. Rather, the defendant argues that because the West Virginia Consumer Credit and Protection Act is consistent with federal law, the defendant's investigation into possible violations of the state statute is not barred by the NBA. As the plaintiffs point out, however, the defendant's argument confuses visitorial powers with preemption. That is, the cases and regulations cited by the defendant concern *what* law applies, whereas the question here is who should enforce the applicable law, regardless of whether it is state or federal in origin. *See Clearing House Ass'n*, 510 F.3d at 120 (noting that non-preempted state laws "remain enforceable by private parties, as well as by the OCC itself"); *Boutris*, 419 F.3d at 963–64 ("[T]he preemption of state law accomplished by § 484(a) is entirely procedural, not substantive. The exclusively federal power to 'visit' national banks is not the power to oust all state regulation of those entities.").

Because the issue is not before me, I take no position on whether the West Virginia Consumer Credit and Protection Act is preempted by federal law.[3] I do **FIND,** however, that by issuing subpoenas against Capital One Bank and COSI and seeking to enforce these subpoenas, the defendant is exercising visitorial powers within the meaning of 12 U.S.C. § 484(a) and 12 C.F.R. § 7.4000(a).

### C. Timing

■ In addition to arguing that it is not exercising visitorial powers, the defendant argues that it should be permitted to enforce its subpoenas for conduct that occurred prior to Capital One's conversion to a national bank. (Def.'s Mot. 1.) The defendant submits that it can find no law that gives the OCC the authority to exercise visitorial power over a national bank for the time period before it became a national bank. (*Id.*) Thus, the defendant implies, the defendant must be able to exercise visitorial powers for this time period. (*Id.* at 1–2.)

The plaintiffs assert that there is no support for the defendant's argument that it can exercise visitorial powers over a national bank if it limits its investigation to the time period when the bank was state chartered. (Pls.' Resp. 9.) The plaintiffs also maintain that by the defendant's logic, "he would be able to visit any national bank in the country that operates in West Virginia, so long as his visitation were limited to banking activities carried on before the bank became a national bank,

even if that conversion occurred many years ago." (*Id.* at 10.) "Such a result would fundamentally undermine the visitorial exclusivity that the National Bank Act plainly intended to confer on the OCC." (*Id.*) Finally, the plaintiffs assert that the defendant's argument would "eviscerate section 484(a)'s purpose of relieving national banks of the 'burdens and undue duplication state controls could produce,' because national banks would forever be subject to dual regulation as to activities predating their conversion." (*Id.* at 10–11 (quoting *Watters,* 127 S.Ct. at 1568).)

Perhaps recognizing the strength of the plaintiffs' argument, the defendant limited the scope of its subpoena of Capital One to "conduct, policies, and transactions that occurred or existed before March 1, 2008." (Def.'s Reply 1.) The defendant contends that the issue before the court is now

> whether a state-chartered bank that receives a lawful investigatory subpoena from the Attorney General may—by delaying the subpoena enforcement proceedings—defeat the subpoena by converting to a national bank and claiming that the OCC's "exclusive" regulatory authority under the National Bank Act precludes the State from investigating conduct that occurred entirely while the bank was subject to the State's regulatory authority, not to the OCC's.

(*Id.* at 1–2.) The defendant argues that this case involves extraordinary circumstances and that a ruling on these atypical facts will not subject all national banks to dual regulation forever. (*Id.* at 2.) The

---

**3.** The defendant does not argue that its investigation is permissible because it falls within the "vested in the courts of justice" exception in § 484(a). I note that even if the defendant made this argument, it would be unlikely to succeed. *See Clearing House Ass'n,* 510 F.3d at 117 ("If a state official could sidestep the Act's restriction on the exercise of visitorial powers simply by filing a lawsuit, the excep-

tion would swallow the rule. Moreover, as we note above, the sovereign's bringing of an action in court was a primary means of exercising visitorial powers at common law. Because *Guthrie* involved a suit initiated by a private plaintiff, the *only* possible exercise of visitorial powers would have been by the court itself.")

plaintiffs, on the other hand, point out that there is no law supporting the defendant's position, and that regardless of what time period the defendant is investigating, the subpoena will be enforced against a national bank, not a state bank. (Pls.' Request to Respond Regarding Def.'s "Amendment" to Subpoena 1–3.)

The defendant would have the court fashion a special rule that states, in essence, that notwithstanding § 484(a) of the NBA, a state official may exercise visitorial powers over a national bank so long as (1) the state seeks to investigate activities that the bank engaged in before achieving national bank status, and (2) the state's investigation began before the bank converted to a national bank. I will not conjure such a rule. If the defendant enforces its subpoena as amended against Capital One, it will be exercising visitorial power over a national bank. Section 484(a) prohibits such actions. Consequently, I **FIND** that the defendant cannot exercise visitorial powers over a national bank regardless of when the activities sought to be investigated occurred.

### D. Conclusion Regarding Capital One

Neither party disputes that Capital One is a national bank. I have found that the defendant's continued attempt to enforce its subpoena constitutes a visitation. The NBA and federal regulations prohibit state officials from visiting national banks. Accordingly, I **FIND** that the defendant may not, as a matter of law, enforce its subpoena against Capital One, and the defendant's motion to dismiss is **DENIED in part.**

In light of the above finding, the plaintiffs are entitled to a declaratory judgment that (1) the defendant and his agents may not pursue the subpoena issued against Capital One or the petition for enforcement of the subpoena against Capital One,

and (2) the defendant and his agents may not investigate or sue Capital One regarding credit card lending.

Finally, pursuant to Federal Rule of Civil Procedure 65, I permanently **ENJOIN** the defendant and his agents from issuing subpoenas or demanding the inspection of the books and records of Capital One in connection with the defendant's investigation into credit card lending. Further, the defendant is permanently **ENJOINED** from seeking to enforce the subpoena referenced in *State of West Virginia ex rel. Darrell V. McGraw, Jr., Attorney General v. Capital One Bank*, Misc. Action No. 05–C–71 (Circuit Court of Lincoln County).

While I find that federal law requires this result, I am sympathetic to the defendant, whose lawful investigation was hijacked by Capital One's conversion to a national bank. The broad definition of "visitorial" espoused by the OCC allows it to usurp West Virginia's power to investigate whether national banks have violated West Virginia consumer protection law. I share the concerns expressed by Judge Cardamone in *Clearing House Ass'n. See Clearing House Ass'n*, 510 F.3d at 126–34 (Cardamone, J., concurring in part and dissenting in part). As noted by Judge Cardamone, "[b]y leaving state substantive law in place, while at the same time denying the state any role in enforcing that law, § 7.4000 erodes a key aspect of state sovereignty, confuses the paths of political accountability, and allows a federal regulatory agency to have a substantial role in shaping state public policy." *Id.* at 130–31. "If the OCC fails adequately to enforce state law against national banks, state officials could bear the brunt of public disapproval while federal officials remain insulated from the electoral ramifications of their enforcement policies." *Id.* at 133. Moreover, it is questionable whether

the OCC will be as motivated or as effective in protecting the consumers of West Virginia as is the West Virginia Attorney General.

Nevertheless, it is my duty to apply the law as it is, not as I would have it be. I find that the law, as I interpret it, requires a finding that the defendant's investigation is a prohibited visitation of a national bank. It is for Congress to decide whether to rein in the OCC and allow both states and the federal government to enforce their sovereign laws designed to protect the people from abusive and misleading credit card practices.

### E. Visitorial Powers and COSI

■ Having found that the defendant's investigation of Capital One is prohibited by the NBA, I must now determine whether the NBA also shields COSI, which is not a national bank, from the scrutiny of the defendant's investigation into credit card activities. The plaintiffs argue that the defendant should not be allowed to "circumvent section 484(a)" by subpoening COSI because "the protections of the National Bank Act extend to agents of national banks carrying out banking activities at the behest of those banks." (Pls.' Resp. 2.) If the defendant is able to exercise visitorial authority over COSI, the plaintiffs argue, Capital One will impermissibly be forced to choose between exercising its "federal right to operate through agents and their federal right to be free of state visitation." (*Id.*)

The NBA states that "no *national bank* shall be subject to any visitorial powers except as authorized by Federal law." 12 U.S.C. § 484(a) (emphasis added). Similarly, the OCC's regulations provide that "[o]nly the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to *national banks.*" 12 C.F.R. § 7.4000(a) (emphasis added).

The Supreme Court recently held that § 484(a) shields operating subsidiaries of national banks from state visitorial control. *See Watters,* 127 S.Ct. at 1565-65. In light of the plain language of § 484(a), the Supreme Court's focus on operating subsidiaries in *Watters,* and considerations of sound public policy, I decline the plaintiffs' invitation to extend the reach of § 484(a) any further. I therefore **FIND** as a matter of law that § 484(a) of the NBA does not prevent the defendant from enforcing its subpoena of COSI.

Before diving into *Watters,* I must first briefly describe the relationship between Capital One and COSI. Capital One is a national bank and is a subsidiary of Capital One Financial Corporation. (Compl. ¶ 2.) COSI is a Delaware corporation and is also a subsidiary of Capital One Financial Corporation. (Compl. ¶ 3.) It is undisputed that Capital One is a national bank and COSI is not. (*Id.* ¶¶ 2–3.) According to the complaint, COSI "services" Capital One in connection with its credit card and related banking practices. (*Id.*) The plaintiffs also allege that COSI "does not issue any credit cards or provide consumers with its own banking services." (*Id.*) The plaintiffs do not state in their complaint what services or support COSI provides for Capital One. Rather, the plaintiffs allege that Capital One relies on COSI to carry out its national banking functions and is "a duly authorized agent" of Capital One through which Capital One "carries on the business of banking." (*Id.* ¶¶ 23–24.)

The plaintiffs further specify the activities of COSI by means of an affidavit. According to Amy Cook, Associate General Counsel for Corporate Governance of Capital One Financial Corporation, COSI "is a servicing entity that provides internal administrative and operational support to" Capital One. (Cook Aff. ¶ 5, Attached to Pls.' Brief.) Cook avers that COSI "has

never issued credit cards, made loans, accepted payments, or engaged in any banking functions, except in its capacity as a service provider to Capital One Bank (USA), N.A." (*Id.*) Cook avers that COSI does, however, provide the following services to Capital One: (1) marketing, advertising, and solicitation of all bank products; (2) bank account management, including issuance of account statements; (3) customer service activities and communications; (4) payment remittance and payment processing; (5) collections; and (6) other acts of servicing accounts and/or products issued by Capital One. (*Id.* ¶ 7.) Cook states that the services provided by COSI are necessary for Capital One to provide banking activities permitted by the NBA, and that "any information and documents regarding Capital One credit card or bank practices in [COSI's] possession relate exclusively to the operations of [Capital One] and are available to [COSI] only in connection with the service it provides to [Capital One]." (*Id.* ¶ 10.)

The plaintiffs do not allege that COSI is an operating subsidiary of a national bank. An operating subsidiary is a subsidiary of a national bank that is licensed by the OCC and subject to OCC oversight pursuant to 12 C.F.R. § 5.34. "An operating subsidiary conducts activities ... pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank." 12 C.F.R. § 5.34(e)(3). Because COSI is not an operating subsidiary of a national bank, its activities are not so limited.

That COSI is neither a national bank nor an operating subsidiary of a national bank is significant. National banks are shielded from state visitations by § 484(a) of the NBA. 12 U.S.C. § 484(a); 12 C.F.R. § 7.4000(a)(1). Moreover, in *Watters*, the Supreme Court held that operating subsidiaries of national banks are immune from

state visitorial control to the same extent as national banks. *Watters*, 127 S.Ct. at 1564–65. As a consequence, if COSI were a national bank or an operating subsidiary of a national bank, the defendant could not enforce its subpoena against COSI, just as it cannot pursue its subpoena of Capital One.

The key issue then, as far as COSI is concerned, is just how far § 484(a)'s shield extends. Because the NBA is silent regarding non-banks, and the OCC's regulations mention only operating subsidiaries, the starting point in determining the reach of § 484 is *Watters*. The case arose when Linda Watters, the Commissioner of Michigan's Office of Insurance and Financial Services, attempted to apply Michigan mortgage lending regulations to the operating subsidiary of a national bank. *Watters*, 127 S.Ct. at 1565–66. Under the Michigan statutory regime, national banks are exempt from state mortgage lending regulations, but mortgage brokers, lenders, and servicers that are subsidiaries of national banks must submit to state supervision. *Id.* at 1565. When Wachovia Mortgage became a wholly owned operating subsidiary of Wachovia Bank, a national bank, it surrendered its mortgage lending registration on the grounds that it was no longer subject to the Michigan statutory regime. *Id.* Watters disagreed, and she notified Wachovia Mortgage that it would no longer be authorized to conduct mortgage lending activities in Michigan. *Id.* In response, Wachovia Mortgage and Wachovia Bank filed suit seeking injunctive relief prohibiting Watters from enforcing Michigan's mortgage lending regulations against Wachovia Mortgage and "interfering with OCC's exclusive visitorial authority." *Id.* The district court granted summary judgment in favor of the plaintiffs and the Sixth Circuit affirmed. *Id.* at 1566.

The Supreme Court agreed with the lower courts and held that "Wachovia's mortgage business, whether conducted by the bank itself or through the bank's operating subsidiary, is subject to OCC's superintendence, and not to the licensing, reporting, and visitorial regimes of the several States in which the subsidiary operates." *Id.* at 1564–65. The court began its analysis by noting that it was clear that "federal control shields national banking from unduly burdensome and duplicative state regulation." *Id.* at 1566–67. The Court reiterated that it interprets "grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Id.* at 1567 (quoting *Barnett Bank of Marion Cty., N.A. v. Nelson,* 517 U.S. 25, 32, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996)).

Turning to specifics, the Court noted that the NBA authorizes national banks to engage in mortgage lending, and that "real estate lending, when conducted by a national bank, is immune from state visitorial control." *Id.* at 1568. The Court also pointed out that the NBA gives national banks the power "to exercise all such incidental powers as shall be necessary to carry on the business of banking." *Id.* at 1564. One of these incidental powers is the ability of national banks to do business through operating subsidiaries. *Id.* at 1569 ("Since 1966, OCC has recognized the 'incidental' authority of national banks under § 24 Seventh to do business through operating subsidiaries."). The court emphasized that the "OCC licenses and oversees national bank operating subsidiaries just as it does national banks" and that operating subsidiaries "may engage only in activities national banks may engage in directly." *Id.* at 1569–70. The Court further emphasized that "for supervisory purposes, OCC treats national banks and their operating subsidiaries as a single economic enterprise." *Id.* at 1570.

After discussing the close relationship between operating subsidiaries and national banks, the Court rejected Watters' argument that because operating subsidiaries are separately chartered from national banks, they are simply "affiliates" of national banks that are subject to OCC and state control. *Id.* at 1569. "Security against significant interference by state regulators is a characteristic condition of the business of banking' conducted by national banks, and mortgage lending is one aspect of that business. . . . That security should adhere whether the business is conducted by the bank itself or is assigned to an operating subsidiary licensed by the OCC whose authority to carry on the business coincides completely with that of the bank." *Id.* at 1571. Finally, the Court stated that "state regulators cannot interfere with the 'business of banking' by subjecting national banks or their OCC-licensed operating subsidiaries to multiple audits and surveillance under rival oversight regimes." *Id.* at 1573.

Since the Supreme Court issued its opinion in *Watters,* only a few courts have discussed it in detail. In *SPGGC, LLC v. Ayotte,* 488 F.3d 525 (1st Cir.2007), the First Circuit held that a New Hampshire law that prohibited the sale of gift cards that carry expiration dates or administrative fees was preempted when applied to gift cards issued by national banks. *Id.* at 527. The plaintiff Simon, a mall owner, contracted with U.S. Bank, a national bank, to sell Simon-branded U.S. Bank-issued gift cards at its malls. *Id.* at 529. The contract stated that U.S. Bank would be considered the issuer of the gift cards and would be considered "national bank products." *Id.* The purchaser of the gift card had a contractual relationship with U.S. Bank only, U.S. Bank was responsible

for servicing the card, and any fees associated with the card was set and collected by U.S. Bank. *Id.*

Under the New Hampshire Consumer Protection Act ("CPA"), it was unlawful to sell gift cards with expiration dates or administrative fees. *Id.* at 528. In 2004, the New Hampshire Attorney General threatened to bring an enforcement action against Simon to prevent it from selling gift cards that violated state law. *Id.* Simon then brought suit in federal court seeking a declaration that the CPA was preempted as applied to gift cards issued by national banks. *Id.* at 528, 530. The district court found that the NBA authorized national banks to sell gift cards and that the CPA substantially frustrated the ability of U.S. Bank to sell gift cards in New Hampshire. *Id.* at 530. The district court consequently found that the NBA preempted the CPA with respect to products issued by national banks. *Id.*

The First Circuit agreed with the district court. The court first found that it was within a national bank's powers to issue and sell gift cards and that the NBA authorized national banks to use agents to carry out some of their activities. *Id.* at 532. The issue then became "whether the New Hampshire CPA frustrates the exercise" of the power to sell gift cards through third party agents. *Id.* The Attorney General argued that the CPA did not conflict with the NBA, and was therefore not preempted, because it regulated only Simon, "a company that is not a national bank." In response, the court of appeals stated that this analysis was too formalistic. *Id.* Citing *Watters*, the court stated that "the question here is not *whom* the New Hampshire statute regulates, but rather, against *what activity* it regulates." *Id.* (citing *Watters*, 127 S.Ct. at 1570). The First Circuit ultimately held that "where Simon's role is limited to acting as

USB's agent in marketing and selling the giftcards, the facts of the case support a finding of preemption." *Id.* at 534.

In a similar case, the Second Circuit emphasized the fact-specific nature of the *Watters* holding. In *SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2007), "SPGGC, LLC, a seller of pre-paid gift cards, sued to prevent the Connecticut Attorney General from enforcing a state consumer protection law that regulates the terms and conditions of such cards." *Id.* at 186. In this case, SPGGC sold gift cards issued by Bank of America, a national bank. *Id.* "Although [Bank of America] was the issuer of the Simon Giftcard, SPGGC bore the costs of administering the program and also collected and retained maintenance and other fees associated with the cards." *Id.* at 191. The court noted that "[w]hile [Bank of America] had review and approval authority over any terms and conditions the Giftcards carried," it was not clear whether it had the authority to establish such terms in the conditions in the first instance, as that power belonged to SPGGC. *Id.*

As in New Hampshire, Connecticut had a statute that prohibited the sale of gift cards that contained expiration dates or certain fees. *Id.* at 187. Because SPGGC's gift cards contained these fees and expiration dates, the Connecticut Attorney General threatened to bring an enforcement action against SPGGC for violating the Connecticut Gift Card Law. *Id.* SPGGC filed an action in federal court seeking a declaratory judgment that the proposed enforcement action was preempted by the NBA. *Id.* The district court granted the Attorney General's motion to dismiss. *Id.* at 188. In so doing, the district court rejected any analogy between SPGGC and an operating subsidiary. *Id.* at 190. Instead, the district court found that SPGGC had a close agen-

cy relationship with Bank of America but that the relationship was insufficient to entitle SPGGC to protection under the NBA. *Id.*

The Second Circuit affirmed in part and reversed in part the district court's ruling. *Id.* at 186. According to the court, it was "beyond genuine dispute that national banks have the authority under federal law to develop and market gift cards." *Id.* at 189. The court also noted that the Connecticut Gift Card Law would be preempted if applied to a national bank or the operating subsidiary of a national bank but that "SPGGC is neither a national bank nor the operating subsidiary of a national bank." *Id.* The court of appeals agreed with SPGGC and the OCC that "the district court's preemption analysis should have focused less on the identity of the plaintiff, SPGGC, than on whether and to what extent the Simon Giftcard represented an exercise of [Bank of America's] powers as a national bank." *Id.* at 190. The court held that SPGGC failed to state a valid preemption claim regarding the Connecticut Gift Card Law's prohibition of gift card fees. *Id.* at 191. The court also held, however, that SPGGC stated a valid preemption claim insofar as the Connecticut Gift Card Law prohibited expiration dates on gift cards. *Id.*

The court cautioned that "it would be a mistake to read *Watters* so broadly as to obscure the unique role assigned to operating subsidiaries in the context of national banking regulation." *Id.* at 190. This is because "[t]he Court in *Watters* observed that unlike other types of national bank affiliates, 'an operating subsidiary is tightly tied to its parent by the specification that it may engage only in the "business of banking" as authorized by the Act.'" *Id.* (citing *Watters*, 127 S.Ct. at 1571–72). The court of appeals also noted that "the authority of national banks to do business

through operating subsidiaries is itself a power that Congress granted to the banks through the NBA" and, in contrast, the relationship between Bank of America and SPGGC "enjoys no special status under the statute." *Id.*

*Ayotte and Blumenthal*, while relevant to this court's analysis, are distinguishable from this case because they dealt with preemption of state law, not visitation. The Second Circuit did deal with visitation in *Clearing House Ass'n v. Cuomo*, 510 F.3d 105 (2d Cir.2007), albeit in dicta. The Second Circuit noted that "[i]n *Watters*, the Court emphasized the unique characteristics of national bank operating subsidiaries, which are 'licensed by OCC' and whose authority to carry on the business of banking—according to statute—coincides completely with that of the parent bank." *Clearing House Ass'n*, 510 F.3d at 105 n. 7 (citing *Watters*, 127 S.Ct. at 1571). Further, the "Court pointed out that Congress has distinguished operating subsidiaries from other 'affiliates' of national banks." *Id.* "[W]hile we hold below that, in accordance with OCC regulations, the Attorney General is precluded from investigating either parent national banks or their operating subsidiaries for alleged violations of state fair lending laws, our reasons for this conclusion would not apply to the quite different question of whether a state investigation or enforcement action directed at any other type of national bank affiliate would necessarily violate § 484(a)." *Id.*

I agree with the Second Circuit, and in particular, I agree with its statements in *Clearing House Ass'n*. Section 484(a) of the NBA immunizes only national banks from state visitorial control. Because operating subsidiaries of national banks are treated as equivalent to national banks, *Watters*, 127 S.Ct. at 1570, the Supreme Court held in *Watters* that § 484(a) protects operating subsidiaries from state visi-

tation. The Court in *Watters* did state that it has "never held that the preemptive reach of the NBA extends only to a national bank itself" and that it "focused on the exercise of a national banks powers, not on its corporate structure." *Id.* These statements should not be taken out of context. An operating subsidiary of a national bank, unlike a national bank's third-party agent, "is tightly tied to its parent by the specification that it may engage only in 'the business of banking.'" *Id.* at 1571–72. Moreover, national banks and their operating subsidiaries are regulated as a single economic enterprise. *Id.* at 1570. Thus, the reasoning of *Watters,* which focused on the special characteristics of operating subsidiaries, does not compel me to find that third-party agents of national banks are immune from the scrutiny of state regulators.

I am compelled, however, to apply the plain language of § 484(a) of the NBA. Were I to extend § 484(a)'s protections third-party corporations such as COSI, the term "national bank" would not longer mean "national bank." Rather, it would mean "national bank and any entity that can find a way to graft itself, remora-like, to a national bank." Public policy also counsels against extending the reach of § 484(a). As I noted above, every time § 484(a) is broadened and state regulation is supplanted by that of the OCC, state sovereignty erodes, political accountability dissipates, and a federal agency's role in shaping state policy increases. I must be especially cognizant of these dangers in cases, like this one, involving a state's ability to enforce its consumer protections laws, given that "[c]onsumer protection is quintessentially a 'field which the States have traditionally occupied.'" *Watters,* 127 S.Ct. at 1581 (Stevens, J., dissenting) (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

Furthermore, it would be anomalous if "a *state* corporation can avoid complying with *state* regulations, yet nevertheless take advantage of *state* [corporation] laws insulating its owners from liability." *Id.* at 1585. Construing § 484(a) expansively "may drive companies seeking refuge from state regulation into the arms of federal parents, harm those state competitors who are not lucky enough to find a federal benefactor, and hamstring States' ability to regulate the affairs of state corporations." *Id.* Justice Stevens, joined by Chief Justice Roberts and Justice Scalia, issued this warning with respect to operating subsidiaries of national banks, and the same concerns apply with even greater force when applied to third-party corporations acting on behalf national banks.

In conclusion, I **FIND** as a matter of law that § 484(a) of the NBA does not protect COSI from the state's investigation into whether COSI has violated West Virginia law. Therefore, I **FIND** that, even taking the allegations in the plaintiffs' complaint as true, COSI has failed to state a claim upon which relief can be granted. The defendant's motion to dismiss is **GRANTED in part,** and the plaintiffs' claims for declaratory and injunctive relief, insofar as they relate to COSI, are **DISMISSED with prejudice.**

### F. Plaintiff's § 1983 Claims

In Counts Three and Four of the plaintiffs' complaint, they allege that the defendant seeks to deprive Capital One and COSI of their "right to be free from unlawful exercises of visitorial powers and unlawful attempts obstruct and condition the exercise of its incidental and enumerated banking powers" in violation of 42 U.S.C. § 1983. (Compl. ¶¶ 32–42.) The defendant argues that the NBA does not provide national banks with rights enforce-

able under § 1983. (Def.'s Mem. 13.) The plaintiffs argue that the NBA, particularly 12 U.S.C. § 484(a), confers on national banks a right to be free from unlawful visitation that is enforceable under § 1983.

Section 1983 provides a remedy for the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Consequently, § 1983 actions may be brought against state actors to enforce rights created by federal statutes as well as by the Constitution. *Id.* at 279, 122 S.Ct. 2268. Typically, courts look at three factors in determining whether a federal statute creates a right enforceable under § 1983. *See Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). "First, Congress must have intended that the provision in question benefit the plaintiff." *Id.* In the second step, "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Id.* at 340–41, 117 S.Ct. 1353. "Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* at 341, 117 S.Ct. 1353. Notwithstanding these factors, the overarching consideration in determining whether a statute creates § 1983 rights is Congress's intent. *Gonzaga Univ.*, 536 U.S. at 283, 122 S.Ct. 2268. "Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286, 122 S.Ct. 2268.

This court has found only three cases where federal courts discussed whether § 484 of the NBA creates rights enforceable under § 1983. The most succinct treatment of the issue is found in *Wachovia Bank, N.A. v. Watters*, 334 F.Supp.2d 957 (W.D.Mich.2004). There the court first noted that the "incidental powers of [12 U.S.C.] § 24 Seventh do not establish an unambiguously conferred right to be free from state visitorial authority." *Watters*, 334 F.Supp.2d at 966. Rather, "[i]t is § 484 which extends the OCC's exclusive visitorial authority to national bank operating subsidiaries." *Id.* The court held that § 484 does not grant rights to national banks because "[t]he OCC regulatory scheme was 'intended primarily for the benefit of the public and the commonwealth, not for the benefit of banks and bank directors.'" *Id.* (quoting *In re Franklin Nat. Bank Sec. Litig.*, 445 F.Supp. 723, 731 (D.C.N.Y.1978)).

A district court reached the opposite conclusion in *Wachovia Bank, N.A. v. Burke*, 319 F.Supp.2d 275 (D.Conn.2004). In that case, the court applied the three *Blessing* factors. *Burke*, 319 F.Supp.2d at 288. Looking at the language of § 484(a), the court found that the NBA "clearly intended to confer advantages on national banks like Wachovia, and more particularly, the precise benefit of being free from state visitation." *Id.* at 288–89. The court also reasoned that the language of § 484(a) mirrored the "no person shall be subject to discrimination" language in Titles VI and IX, which do create federally enforceable rights. *Id.* at 289. As for the other *Blessing* factors, the court found that the right created by § 484 was not too vague and amorphous for judicial enforcement and that § 484 was couched in mandatory rather than precatory terms. *Id.*

The district court in *Burke*, however, was reversed by the Second Circuit. *See Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir.2005). In doing so, the court

of appeals first noted that they understood "the *Gonzaga University* majority and concurring opinions to mean, at least, that courts should not find a federal right based on a rigid or superficial application of the *Blessing* factors where other considerations show that Congress did not intend to create federal rights actionable under § 1983." *Burke,* 414 F.3d at 322. The court then found that the district court's analysis "fail[ed] to account for the unique role of national banks in the statutory scheme of the NBA." *Id.* "When viewed as a whole in light of its history, it is plain that the NBA addresses the allocation of federal versus state regulatory power and does not provide national banks with rights enforceable under § 1983." *Id.* The court reasoned that while § 484 focuses on national banks, "the structure and history of the provisions indicate that Congress did not intend to provide national banks with individual rights as private entities." *Id.* Rather, "[i]t has long been held that 'national banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States.'" *Id.* (quoting *Davis v. Elmira Sav. Bank,* 161 U.S. 275, 283, 16 S.Ct. 502, 40 L.Ed. 700 (1896)). According to the Second Circuit, "Congress created national banks as instruments to foster a national banking system," and "when congressional pre-emption benefits particular parties only as an incident of the federal scheme of regulation, a private damages remedy under § 1983 may not be available." *Id.* at 323 (quoting *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 109, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989)).

The court also found that because the powers granted to national banks do not involve important personal rights akin to those protected by the Fourteenth Amendment, "the presence of a superficial parallel between the language of 12 U.S.C. § 484 and the language in certain anti-discrimination provisions does not compel an inference that Congress intended to provide national banks with federal rights." *Id.* at 324. In closing, the Second Circuit noted that if it were to find that national banks have enforceable § 1983 rights, national banks could bring § 1983 actions whenever the NBA and OCC regulations preempted a state law. This outcome, the court concluded, would be "inappropriate in light of the complex regulatory framework and the ever-changing nature of the industry and the powers exercised by national banks." *Id.* Further, the prospect of damages and attorneys' fees "could have widespread repercussions for the balance of federal and state regulatory authority in general." *Id.*

I find the reasoning of the Second Circuit in *Burke* and the district court in *Watters* persuasive. I **FIND** that in enacting 12 U.S.C. § 484(a), Congress intended to balance the authority of the federal government against that of the states and did not intend to grant national banks federal rights. I therefore **FIND** that § 484 of the NBA does not provide national banks with rights enforceable under 42 U.S.C. § 1983. I **GRANT in part** the defendant's motion to dismiss and **DISMISS** the plaintiffs § 1983 claims.

### III. Conclusion

The defendant's Motion to Dismiss is **DENIED in part** and the defendant is **ENJOINED** from enforcing his subpoena against Capital One, as set forth above. The defendant's Motion to Dismiss is also **GRANTED in part.** COSI's claims for declaratory and injunctive relief are **DISMISSED with prejudice,** as are both plaintiffs' § 1983 claims. The defendant's Motion to Unseal File for the Limited Purpose of Appointing Amicus Curiae is **DENIED as moot.**

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.